**FIDELITY AND DEPOSIT COMPANY OF MARYLAND, Plaintiff-Appellee,**

v.

**USAFORM HAIL POOL, INC., et al., etc., Defendants-Appellants.**

No. 74–1492.

United States Court of Appeals, Fifth Circuit.

Nov. 20, 1975.

W. Warren Cole, Jr., Thomas T. Cobb, Daytona Beach, Fla., for defendants-appellants.

George Stelljes, Jr., Jacksonville, Fla., Elmer W. Beasley, Hartford, Conn., for plaintiff-appellee.

Before MURRAH * and WISDOM, Circuit Judges, and GORDON, District Judge.

WISDOM, Circuit Judge:

This is the third appeal of this case. First, we held that representatives of individuals and companies doing business with various corporations in a corporate complex controlled by one dominant shareholder could not maintain an action as third party beneficiaries on a fidelity bond insuring those corporations. *American Empire Insurance Co. of South Dakota v. Fidelity & Deposit Co. of Maryland*, 5 Cir. 1969, 408 F.2d 72. This litigation focuses on the collapse of that corporate complex. In the second appeal

---

* Senior Circuit Judge of the Tenth Circuit, sitting by designation. Judge Murrah concurred

we held that even though it was clear that the dominant shareholder had fraudulently diverted monies held in trust for these individuals and companies, that fact in itself did not make out a "loss" within the meaning of the bond. *Fidelity & Deposit Co. of Maryland v. USAFORM Hail Pool, Inc.*, 5 Cir. 1972, 463 F.2d 4. In this appeal, we hold, first, that we have appellate jurisdiction, and, on the merits, that the district court misapprehended the mandate of the 1972 opinion. Much as we regret the *Jarndyce v. Jarndyce* see generally C. Dickens, Bleak House aspect of this case, we vacate the 1972 judgment and remand the case for further proceedings consistent with this opinion.

## I.

Fidelity & Deposit Co. (Fidelity) argues that this appeal must be dismissed for lack of appellate jurisdiction.

The district court held a hearing in compliance with the mandate of this Court on remand from the second appeal of this case on January 26, 1973. The court took the case under advisement. About six months later, it entered an order dismissing the claims of the appellants against Fidelity on the merits with prejudice. On the same day, the clerk of the court entered the judgment on the docket. It is undisputed, however, that the clerk failed to notify any of the parties of the entry of the judgment, as the clerk is required to do by F.R.Civ.P. 77(d). This rule provides:

*Notice Of Orders Or Judgments.*

Immediately upon the entry of an order or judgment the clerk shall serve a notice of the entry by mail in the manner provided for in Rule 5 upon each party who is not in default for failure to appear, and shall make a note in the docket of the mailing. Such mailing is sufficient notice for all purposes for which notice of the entry of an order is required by these rules; but any party may in addition serve a

in the above opinion before his death October 30, 1975.

notice of such entry in the manner provided in Rule 5 for the service of papers. Lack of notice of the entry by the clerk does not affect the time to appeal or relieve or authorize the court to relieve a party for failure to appeal within the time allowed, except as permitted in Rule 4(a) of the Federal Rules of Appellate Procedure.

On November 13, 1973, one hundred and three days after the judgment had been entered, counsel for the appellants learned of the entry of the judgment for the first time. On November 19, 1973, the appellants moved the district court for a new trial or, in the alternative, for judgment under F.R.Civ.P. 60(b), or for leave to file the notice of appeal instanter. On the same day, the appellants also filed a notice of appeal from the original judgment. On January 14, 1974, the district court, after a hearing, denied the motions for new trial and leave to file the notice of appeal instanter, but granted the motion for relief from judgment under F.R.Civ.P. 60(b), and entered an order vacating and reentering its original findings of fact, conclusions of law, and judgment. On February 4, 1974, the appellants filed a second notice of appeal, this one from the newly entered judgment.

From the supplemental briefs this Court has requested on the point, it appears that after the hearing on January 26, 1973, counsel for the appellants diligently made repeated inquiries of the district court to determine whether judgment had been entered. The appellants' counsel made his last inquiry some time in July 1973. The court, through a member of its staff, informed him that no further inquiry should be made—because the clerk would notify the parties of the judgment when it was entered. In reliance upon this assurance, counsel did not inquire further. After several months had passed, however, counsel renewed his inquiry, and, for the first time, on November 13, 1973, was informed that judgment had been entered.

The third paragraph of F.R.App.P. 4(a) provides:

Upon a showing of excusable neglect, the district court may extend the time for filing the notice of appeal by any party for a period not to exceed 30 days from the expiration of the time otherwise prescribed by this subdivision. Such an extension may be granted before or after the time otherwise prescribed by this subdivision has expired; but if a request for an extension is made after such time has expired, it shall be made by motion with such notice as the court shall deem appropriate.

This portion of F.R.App.P. 4(a), along with the final sentence of F.R.Civ.P. 77(d), was apparently intended to avoid the result reached in *Hill v. Hawes*, 1944, 320 U.S. 520, 64 S.Ct. 334, 88 L.Ed. 283. The 1946 advisory committee note to the amended F.R.Civ.P. 77(d) stated:

In [*Hill v. Hawes*], an action instituted in the District Court for the District of Columbia, the clerk failed to give notice of the entry of a judgment for defendant as required by Rule 77(d). . . . [D]ue to lack of notice of the entry of judgment the plaintiff failed to file his notice of appeal within the prescribed time. On this basis the trial court vacated the original judgment and then re-entered it, whereupon notice of appeal was filed. The Court of Appeals dismissed the appeal as taken too late. The Supreme Court, however, held that although Rule 77(d) did not purport to attach any consequence to the clerk's failure to give notice as specified, the terms of the rule were such that the appellant was entitled to rely on it, and the trial court in*such a case, in the exercise of a sound discretion, could vacate the former judgment and enter a new one, so that the appeal would be within the allowed time.
. . .

*See* 7 Moore's Federal Practice ¶ 77.01[4].

■ The primary concern of the advisory committee in proposing the amendment was that results such as those

reached in *Hill v. Hawes* seriously affected the finality of judgments. The rationale of the amendment was to enhance the finality of judgments by placing the entire burden of determining whether a judgment had been entered upon the parties. Under amended Rule 77(d), they could place no justifiable reliance upon the fact that no notice of entry of judgment had been received from the clerk, but rather they were obliged to inquire periodically of the clerk or of the district court to determine whether judgment had been entered. The potential hardship to parties whose counsel, through inadvertence or lack of diligence, failed to learn of the entry of judgments is apparent. Less apparent is whether the benefit of enhanced finality outweighs these cases of hardship, and the burden on all concerned with respect to the periodic inquiries the amended rule implicitly contemplates. The courts, however, have generally enforced F.R.Civ.P. 77(d) and F.R.App.P. 4(a) strictly according to their letter, regardless of the hardship involved. As this Court recently said in *In re Morrow*, 5 Cir. 1974, 502 F.2d 520, 523, "To permit an appeal where there is failure to notify, without more, would be opposed to the clear wording and intent of Rule 77(d)." *Morrow* finds support for its analysis in a number of earlier decisions in this and other circuits. *See, e. g., Jackson v. Decker*, 5 Cir. 1971, 451 F.2d 348; *Lord v. Helmandollar*, D.C.Cir. 1965, 348 F.2d 780; *Richland Knox Mutual Ins. Co. v. Kallen*, 6 Cir. 1967, 376 F.2d 360; *Nichols-Morris Corp. v. Morris*, 2 Cir. 1962, 279 F.2d 81; *Sonnenblick-Goldman Corp. v. Nowalk*, 3 Cir. 1970, 420 F.2d 858; *Files v. City of Rockford*, 7 Cir. 1971, 440 F.2d 811; *Lathrop v. Oklahoma City Housing Auth.*, 10 Cir. 1971, 438 F.2d 914.

An exception, however, has grown up in cases presenting mitigating circumstances or special hardships. In *Smith v. Jackson Tool & Die, Inc.*, 5 Cir. 1970, 426 F.2d 5, the district court had circulated its opinion to the parties before entering judgment. Counsel for the appellant, upon reviewing the opinion, requested the court to delay entering final judgment because he would be away from town on a trip. Opposing counsel was notified of this request, and informed the court that he had no objection to a delay in entering judgment. The parties also informed the court that an appeal would be taken. The court, however, did not respond to this request for a delay in entering its judgment, but proceeded to enter the judgment thirteen days after sending the opinion to counsel. Moreover, the court did nothing to advise counsel that the request for delay was being denied. Counsel for the appellant learned of the entry of judgment only after the time for filing notice of appeal had expired. He promptly moved that the judgment be vacated, and the district court, apparently realizing that its treatment of the matter had led counsel to believe that there would be a delay in entering judgment, granted the motion, relying on F.R.Civ.P. 60(b), which provides:

> *Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, Etc.* On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud . . . misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged . . . ; or (6) any other reason justifying relief from the operation of the judgment . . . . A motion under this subdivision (b) does not affect the finality of a judgment or suspend its operation. This rule does not limit the power of a court to entertain an independent action to relieve a party from

a judgment, order, or proceeding, or to grant relief to a defendant not actually personally notified as provided in Title 28, U.S.C., § 1655, or to set aside a judgment for fraud upon the court.

This Court in *Jackson Tool & Die* said that the policy of finality must on occasion give way to unusual circumstances, including lack of prejudice to one party and prejudice to the opposing party. We noted that more was involved in *Jackson Tool & Die* than in the usual case involving the simple failure (however inexcusable) of the clerk to notify the parties of the entry of judgment. The additional factors we noted were that the appellees could not assert surprise at the appellant's desire to appeal the decision, since the parties had already indicated to the court that the judgment would be appealed. Nor was there any prejudice to the appellees, because they had not been notified of the entry of judgment, and of course could not maintain that they relied upon it. In light of the fact that the litigation in *Jackson Tool & Die* had stretched over nine years preceding the entry of judgment, we reasoned that a further extension of time for appeal of a few days in itself would work no prejudice upon the appellees. Finally we noted that the trial judge was well aware of the fact that the parties did not anticipate that he would enter judgment, and, because he had received correspondence with them after entering judgment, that they had not been informed that the judgment had been entered. Because of this apparent reliance on the district court, we held that his later order vacating and reentering judgment under F.R. Civ.P. 60(b)(6) was not an abuse of discretion but was in full accord with the spirit of the rule and with the more general precept that we must construe the Federal Rules of Civil Procedure liberally so as to promote rather than thwart the ends of justice.

More recently, the District of Columbia Circuit considered the problem in *Expeditions Unlimited Aquatic Enterprises, Inc. v. Smithsonian Institute*, 1974, 163 U.S.App.D.C. 140, 500 F.2d 808. The district court, unknown to either of the parties, had entered summary judgment in one of two cases between the parties pending before it. The parties engaged in discovery with respect to the second suit, and ten months elapsed between the entry of judgment and a conversation between the trial court's law clerk and counsel for the appellant in which counsel learned of the entry of judgment. He moved that the trial court vacate the judgment and reenter it so as to preserve the right to appeal, but the court denied the motion. On appeal, the District of Columbia Circuit reversed the district court. It reasoned that F.R. Civ.P. 60(b)(6) justified this form of relief from judgment. It cited *Klapprott v. United States*, 1949, 335 U.S. 601, 69 S.Ct. 384, 93 L.Ed. 266, for the proposition that the provision "vests power in courts adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice." Recognizing the line of authorities under F.R. Civ.P. 77(d) holding that the mere negligence of the clerk did not excuse the parties from failure to file a timely notice of appeal, the court concluded that since "this rule is intended to preserve the finality of judgments," "if the parties do not know of the entry of judgment, the winning party cannot rely on the judgment and the losing party cannot make a 'free, calculated, deliberate' choice not to appeal. . . . In these circumstances the purposes behind Rule 77(d) would not be served by denying the losing party the privilege of appealing . . . ." 500 F.2d at 809. The court distinguished some of the earlier cases decided under F.R.Civ.P. 77(d) on the ground that in those cases "counsel knew of the entry of judgment in time to perfect an appeal under the Rules." 500 F.2d at 809. The court said:

> We believe that a trial court may vacate and re-enter a judgment under Rule 60(b) to allow a timely appeal when neither party has actual notice of the entry of judgment, when the winning party is not prejudiced by the

appeal, and when the losing party moves to vacate the judgment within a reasonable time after he learns of its entry.

The court cited *Jackson Tool & Die* with approval in this regard.

█ In the present case, as in *Expeditions Unlimited and Jackson Tool & Die,* none of the parties knew of the entry of judgment, and none could be said to have relied upon it. In this case, as in *Jackson Tool & Die,* the trial court had been in communication with counsel for the appellant regarding when judgment would actually be entered. In both cases counsel diligently sought to discharge the duty implicit in F.R.Civ.P. 77(d) to make suitable inquiries to discover for itself the status of the case. Indeed, there is an additional element in the present case. Here, unlike the mere failure of the district court in *Jackson Tool & Die* either to postpone entering judgment or to respond to counsel's letters, the district court assured counsel that his repeated inquiries were unnecessary (and, possibly, were beginning to seem repetitious), and that counsel would be informed of the entry of judgment. Moreover, in the present case there was a virtual certainty that an appeal would be taken. This case had been in progress for twelve years, and had been before this Court twice before. The issue then before the district court was a relatively narrow one on which the sides were, as appellants note, "diametrically opposed". An all-or-nothing judgment in the neighborhood of $1,000,000 was at stake, and, as appellants point out, "there was no conceivable way that the district court could have entered a judgment which would not have resulted in another appeal to this Court by one side or the other."

In these circumstances, more is involved than the mere failure of the clerk to discharge his duty under F.R.Civ.P. 77(d). There was no prejudice to either side, because neither side knew of the entry of judgment. Counsel promptly filed notice of appeal after the action of the district court vacating and reentering its judgment. Indeed, counsel at all times acted diligently, and relied upon an express assurance from the district court that they need not continue their inquiries. The case had been fought long and hard, and an appeal by one side or the other was virtually certain. We hold that the trial court acted properly in vacating and reentering its judgment under F.R.Civ.P. 60(b).

## II.

This diversity suit began on August 30, 1963, when Fidelity filed its complaint seeking a declaratory judgment to have its liability determined on a fidelity bond it had issued to certain insured corporations forming parts of the corporate complex F. Wylly Clarke dominated. The first appeal in this case was taken from the action of the district court granting partial summary judgment in favor of Fidelity and against two insurance companies that had intervened as class representatives for the participants in the hail insurance pool and for underwriters who were claiming reinsurance premiums and return premiums from the insured corporations. The insurance companies in the hail pool insured losses to farmers caused by hail storms; they accepted the risk and apportioned profits on a pro-rata basis. The question in the first appeal was primarily one of construction of the bond. This Court held that the intervenors were not third party beneficiaries of the bond. *American Empire Ins. Co. of South Dakota v. Fidelity & Deposit Co. of Maryland,* 5 Cir. 1969, 408 F.2d 72. That disposition is not challenged here.

On remand, the case proceeded to trial and judgment. The trial court rendered a carefully considered opinion and made findings of facts, many of which govern the present appeal. *Fidelity & Deposit Co. of Maryland v. USAFORM Hail Pool, Inc.,* M.D.Fla.1970, 318 F.Supp. 1301. There was no substantial dispute regarding the facts. Indeed, counsel agreed on

extensive pre-trial stipulations. For clarification, we reproduce in the margin a diagram of the relationships among the corporations.[1] This, the parties stipulated, was accurate.

We must also summarize here the findings of the district court in that opinion relevant to this appeal. The insuring agreement given by Fidelity in the bond provided:

The Underwriter [Fidelity], in consideration of the payment of the premium, and subject to Declarations made a part hereof, the General Agreements, Conditions and Limitations, and other terms of this Bond,

1.

### DIAGRAM OF CORPORATE RELATIONSHIPS
### AS STIPULATED BY THE PARTIES*

F. WYLLY CLARKE

Alter Ego, Chief Executive
Officer and, for all prac-
tical purposes, Sole Owner
of These Corporations

USAFORM Hail Pool, Inc.
("USAFORM")

[a Florida corporation]

Organized November 1961.
Assumed all liabilities and
purchased all assets of
"Inc." except $115,000.00
due to "Inc." from Mr. Clarke,
which was retained in "Inc.".

Assets
Transferred
to "USAFORM"

--

Thereafter "USAFORM" operated
the Hail Pool and "Inc." became
dormant, holding as its only
asset Mr. Clarke's debt to it.

[Halifax Insurance Agency, Inc.
Clarke owned 50% of its stock.
It operated a general insurance
agency, and was unrelated to any
of these other corporations.]

U.S. & Foreign Manage-
ment, Ltd.("Ltd.", the
"Parent" Corporation
[and a New York Cor-
poration])

A Reinsurance Broker

U.S. & Foreign Manage-
ment, Inc.("Inc.",
wholly owned Sub. of
"Ltd.")

A Hail Pool Manager

USAFORM Pan American,
Ltd.("Pan-Am" wholly
owned Sub. of "Ltd."
[and a Delaware Cor-
poration])

A Reinsurance Broker

USAFORM International,
Inc. (Wholly owned Sub-
sidiary of "Pan-Am")

*Matter in brackets has been added by this Court.

agrees to indemnify the Insured against any loss of money or other property which the Insured shall sustain through any fraudulent or dishonest act or acts committed by any of the Employees, acting alone or in collusion with others, the amount of indemnity on each of such Employees being the amount stated in Item 3 of the Declarations.

The claimants in the present appeal are three of the corporations named in the bond and riders as insureds. They are USAFORM Hail Pool, Inc. ("USAFORM"), a hail pool manager; U. S. & Foreign Management Ltd. ("Limited"), the parent corporation, a reinsurance broker; and USAFORM Pan American Ltd. ("Pan-Am"), a reinsurance broker. Their claims are based upon a number of alleged fraudulent and dishonest acts by F. Wylly Clarke, who, as the parties stipulated, was the "alter ego", chief executive officer, and for all practical purposes sole owner of the insured corporations.

The district court described the operations of the three corporations as follows:

> USAFORM was organized in November of 1961. During its first and only crop year, 1962, it acted as manager of a pool created by certain insurance companies (pool participants) to cover hail storm damage to crops owned by farmers who were insureds of these pool participants. USAFORM collected the insurance premiums for the pool participants and deposited the premiums in a segregated trust account which belonged to the participants. Under the pooling arrangement, USAFORM was to pay, on behalf of the pool participants, losses to farmers and expenses of the pool, deduct its commissions, and, at the end of the pool's operating year, remit the balance in the premium account to the participants. Thus, each pool year was a self-contained operation, commenced and completed in one year and involving only one growing season. The function of USAFORM was that of a

manager and it sold no insurance of its own.

> Limited and Pan-American likewise sold no insurance but acted as intermediaries between insurance companies desiring to reinsure or "cede" portions of their liability under insurance policies and insurance companies desiring to reinsure portions of the liability under such insurance policies. The reinsurance premiums payable to the reinsuring companies were delivered to Limited and Pan-American for transmittal to the reinsuring companies. By reason of the numerous transactions, there was a constant balance of such reinsurance premium monies on deposit with Limited and Pan-American. These premium monies belonged to the insurance companies (underwriters group) doing business with Limited and Pan-American. Under Sections 125 and 5, Insurance Law, Volume 27, McKinney's Consolidated Law of New York, c. 28, . . . which governed the operation of these two companies, premium monies received by Limited and Pan-American were held in a fiduciary capacity, and were required to be deposited in an account separate from the corporation's own funds. Violation of this anticommingling section is a crime.

The district court carefully stated the issues of fact and law before it for decision as follows:

1. Whether fraudulent or dishonest acts were committed by employees of the insured corporations, within the meaning of those terms as used in the bond, and if so, by whom.

2. Whether the losses resulting from Clarke's actions were such losses as are contemplated by the bond.

3. Whether the fact that Clarke was the alter ego of the insured corporations eliminated F. & D.'s liability for loss occasioned by Clarke's dishonesty.

4. If the insured corporations had "officers" other than Clarke within

the meaning of the bond, (i) whether these "officers" had knowledge of Clarke's dishonesty, and if so (ii) whether these other "officers" acted in collusion with Clarke . . . . .

5. The amount of coverage furnished by the bond.

6. The amount of interest to be allowed to claimants.

With respect to the first issue, the trial court observed that USAFORM during the period in question here held in trust around $4 million, and that this money could be disbursed by it only in one of several carefully defined ways. The court found: "[T]he transfers from the [USAFORM trust account] of approximately $418,000.00 made by Clarke or his employees at his direction, during a time when USAFORM was insolvent, were dishonest and fraudulent invasions by Clarke of a trust fund clearly belonging to the pool participants and amounting to a loss protected by . . . the bond. These wrongful acts were willful and flagrant violations of the fiduciary duty that was owed [to] the pool participants." 318 F.Supp. at 1306.

The Receiver appointed for USAFORM calculated the shortage in the pool participants' trust account at $311,-624.58, and, accordingly, the court awarded this entire amount. Similarly, the court found that there was an invasion in excess of $500,000 of a trust account held by Limited, and that this constituted "a dishonest and fraudulent invasion of a trust fund clearly belonging to the underwriters with whom Clarke dealt . . . ." 318 F.Supp. at 1307. The court made parallel findings with respect to Pan-Am, finding that there was a "dishonest and fraudulent invasion of a trust fund clearly belonging to the underwriters" to the extent of approximately $50,000. *Id.*

Addressing itself to the second issue, whether the losses sustained by the corporations were losses compensable under the bond, the district court summarized Fidelity's argument this way:

F. & D. [Fidelity] contends that as these funds were withdrawn from premium accounts and applied to "proper corporate purposes," and as all such transactions were properly recorded on the books of account of the various corporate insureds, no "loss" within the coverage and meaning of the bond occurred.

The district court held that the unauthorized transfers from the trust accounts were covered by the bond. The court did not address the issue of whether the uses to which the wrongfully transferred funds were put were "legitimate" or "proper" corporate purposes. This turned out to be the only issue upon which we remanded the case to the district court in our 1972 opinion.

On the third issue, the court held that Clarke, even though he was the "alter ego" of the insured corporations, was a covered employee under the terms of the bond. The court boldly stated that "Clarke stole the only thing that he could steal—money that his wholly owned corporations held in trust for others." 318 F.Supp. at 1309. But, the court noted, Fidelity "knew everything about Clarke's operation, including his stock ownership and the fact that he would be managing large sums of money belonging to others; that Clarke controlled the named insured corporations and that he was the only one in [a] position to misappropriate a substantial sum of money." *Id.*

On the fourth issue, the court noted that Fidelity "knew when it wrote the bond that in the event of fraud by Clarke, there was no one to whom it could look or upon whom it could rely to give notice of such misconduct" and that Fidelity "also knew that the only person who could steal anything of consequence was Clarke". 318 F.Supp. at 1309. Therefore, the court reasoned, Fidelity "waived the knowledge and discovery provisions of their bond insofar as Clarke himself was concerned." 318 F.Supp. at 1310. Moreover, the parties had stipulated that Clarke was covered by the bond and that the bond was in full ef-

fect at all relevant times. Finally, the court stated:

It is . . . obvious that the printed form of bond issued by F. & D. simply does not fit the unusual circumstances of this case. F. & D., knowing of these anomalies and knowing that issuance of such a bond in a situation such as this was most unusual, walked into this loss with its eyes wide open. 318 F.Supp. at 1312.

The court's findings on the extent of the bond's coverage and on interest do not concern us here.

On appeal, this Court held that the district court had "used the wrong standard of law in determining the *amount of liability* on the bond", and reversed on that ground. *Fidelity & Deposit Co. of Maryland v. USAFORM Hail Pool, Inc.,* 5 Cir. 1972, 463 F.2d 4 (emphasis added).

Because some of the language in this opinion may have proved confusing to the district court on remand, we must examine it carefully here:

We hold that the taking of money from the premium account of an insured company to pay other *legitimate* obligations *of that company* does not constitute a loss within the meaning of the fidelity bond before us in this case. Since the findings of the district court were not addressed specifically to the question of whether funds taken from the insured companies' premium accounts went to pay *legitimate expenses of the respective companies,* we vacate the judgment . . . and remand the case for further consideration and the entry of additional findings of fact. It goes without saying that any funds diverted to the *personal use of the employees,* to *other* corporations *without legal claims,* or for any purpose at all that was *not for a legitimate corporation purpose* would represent a loss *to the corporation,* and the claimants would be able to recover for such amounts. . . . We have carefully reviewed all other grounds

asserted by appellant and affirm the district court *in all other respects.* 463 F.2d at 7 (emphasis added).

In explaining this holding, this Court implied that the district court had not gone far enough. That court had examined the process by which the premium or trust accounts had been depleted; it had not examined the use to which the wrongfully appropriated monies from the premium or trust accounts were applied. This Court noted that the "bond was written to protect against loss to the *insureds,* not the losses of third parties." 463 F.2d at 5 (emphasis added). To illustrate this point, this Court said: "[T]he case must be viewed as if the insured companies were solvent and had adequate funds in their general accounts to replace the money diverted from the premium accounts. If the insureds cannot recover on the bond in that situation, their insolvency does not improve their case against the bonding company." 463 F.2d at 5–6.

This illustration may have caused confusion in the proceedings on remand. All that this Court said was that a loss is not made out merely by showing that funds were wrongfully diverted from one account within a corporation and applied to another account within that same corporation. We did not mean to imply that the insolvency of the corporation was wholly irrelevant to the district court's task on remand. On the contrary, in certain circumstances insolvency would be highly relevant to and possibly determinative of the question whether a particular disbursement was made for a legitimate corporate obligation. Later in the opinion, in fact, we noted such a case. *Franklin Savings & Loan Co. of Macon v. American Employers Insurance Co.,* 5 Cir. 1938, 99 F.2d 494, involved a payment of dividends in preference to corporate debts to shareholders in violation of state corporate law, which permitted the payment of dividends only out of net earnings as defined by the statute. The statutory provision was intended in part to protect creditors by

preventing payments to shareholders in preference to debts to creditors. It is not clear whether the corporation involved in *Franklin* was "insolvent,[2] but, in light of our focus in *Franklin* on whether the payments were legal under state corporate law, the insolvency of a corporation is properly taken into account in a case of this nature when state corporate law prohibits certain sorts of payments by a corporation which is insolvent.

Another possible source of confusion was this Court's statement that "in this case, before the diversion of the trust funds, the claimants owed legitimate corporate obligations to third parties." 463 F.2d at 6. In our earlier opinion this Court did not mean to imply that every one of the "obligations" paid by the wrongfully appropriated premium monies was indeed legitimate: that was the very question to be determined upon remand. The same is true of the reference in the opinion to using " 'trust' funds to pay legitimate corporation obligations". 463 F.2d at 5. This Court was posing the question, not stating the conclusion to be reached on remand.

A third possible source of some confusion was this Court's reference to the holding of the Fourth Circuit in *Kerr v. Aetna Casualty & Surety Co.*, 4 Cir. 1965, 350 F.2d 146, that "neither wash transactions nor frauds on creditors make out insured losses" under the bond involved in that case. We did not pause to define what sorts of transactions were comprehended within the loose term "wash transactions." The term, of course, is frequently used to characterize a "sale" of a security or commodity in which there is no transfer of beneficial ownership, the transaction being undertaken for some ulterior motive such as the manipulation of market prices. For example, in the *Kerr* case, the questioned transaction "to make a financial

statement of one of the insured corporations look better and so mislead or deceive the Insurance Commissioner or a bank which was considering a loan," but it was not for the purpose of deceiving or despoiling the insured corporations. 350 F.2d at 150. The reference to "wash transactions", with the language just quoted, might be taken to imply that in a case involving a group of corporations related by common ownership, transactions among the corporations are not protected by the bond unless the net financial condition of all of the corporations considered together as one were impaired. Our holding in the earlier appeal, however, which we have quoted above, dispels any such notion when carefully read. It fairly indicates that each corporate tub must stand upon its own bottom. This follows from the reference to "the taking of money from the premium account of an insured company to pay other legitimate obligations *of that company.*" 463 F.2d at 7. In the next sentence, we referred to the "legitimate expenses *of the respective companies.*" *Id.* The district court in its first opinion had carefully analyzed the claimants' position on a company-by-company basis. 318 F.Supp. 1301. That approach was in no way challenged by this Court; rather, we took care to state that the district court's determination was affirmed in all other respects. 463 F.2d at 7. In citing *Kerr*, this Court did not mean to exempt "wash transactions" or "frauds on creditors" from the test to be applied to other transactions: did the corporation making the challenged disbursement owe a legitimate corporate obligation to the corporation or individual receiving the payment?

■ We also note one statement of the district court in its conclusions of law that appears to be the source of much of its analysis of the specific claims. The court said that "in order to

---

**2.** The term may have acquired a specific and somewhat technical definition under the statutory or common law of a particular state. In the absence of such special definition, it usual-

ly means the inability of the corporation to meet its debts as they fall due, or an excess of corporate liabilities over assets.

recover on the bond in this case, it is necessary to prove first of all that the employees committed fraudulent and dishonest acts which caused the insureds a loss." Neither the language of the bond itself, quoted above, nor our 1972 opinion requires causation per se as an element of recovery. The bond requires that there be a fraudulent or a dishonest act *and* a loss to the insured corporation "through" such an act. The findings of fraud and dishonesty were clear and pervasive in the district court's first opinion, and they were affirmed in our 1972 opinion. The issue on remand was loss— whether the wrongfully appropriated monies went to pay legitimate corporate obligations (in which case there would be no "loss") or whether they were made for any other purpose (in which case there would be a "loss"). Good faith, if proved, might save some of the disbursements involved in the present case from the stigma of illegitimacy, but there does not have to be a finding of fraud or dishonesty with respect to every disbursement, viewed apart from the wrongful invasions of trust funds. If it were otherwise, one could hardly imagine a situation in which, given the circumstances involved here, an insurable loss could ever be shown.

On the facts, *General Finance Corp. v. Fidelity & Casualty Co. of New York*, 8 Cir. 1971, 439 F.2d 981, is a case that is very close to the one before us now. Counsel for Fidelity conceded in the earlier appeal that the fidelity bond involved in *General Finance* is identical with the bond involved in this case. In *General Finance*, one individual, Leach, was the president of a group of related, closely-held corporations. He and his wife held the majority of the stock in one of these corporations. The Eighth Circuit, through Mr. Justice Clark, noted that "the overall scheme according to the [claimant] is that Mr. Leach raided [one of the insured corporations] to aid other corporations in the complex." 439 F.2d at 985. Part of the claim in *General Finance* was based upon transfers from GFC, one of the insured corpora-

tions, to Dakota Mutual, which had an agreement for Dakota Underwriters to pay all the "operating and administrative expenses" of the former. Dakota Underwriters, in turn, was owned in substantial part by GFC. Leach was president of all the companies. GFC, at the instance of Leach, issued checks payable to Dakota Underwriters but deposited in Dakota Mutual's bank account. Mr. Justice Clark summarized the argument and holding respecting these transactions as follows:

> The records indicate that the advancements were marked on the books of GFC as unsecured loans. The [bonding company] claims that this loss was due to poor business judgment rather than to acts of fraud or dishonesty. However, the loans or advancements violated the by-laws of GFC requiring the Board of Directors to approve loans in excess of $5,000. Moreover, the action of Mr. Leach in this regard followed a familiar pattern of taking money from GFC to bail out other failing companies. Indeed, the money was advanced when GFC itself was in a deficit condition. Mr. Leach's action in this regard, being fraudulent, was covered by the bond.

439 F.2d at 985.

Another portion of the claim in *General Finance* was based upon allegedly improper payments of dividends. The court noted that the payments of dividends were indeed improper under general principles of state corporate law which prohibit such payments at a time when a corporation is in a "deficit position". Because Leach and his wife owned a majority of the stock, the improper payments of dividends redounded primarily to their benefit. The court held that the improper payments were losses to the insured corporation compensable under the bond, because the bond specifically covered the actions of directors who were also officers, and Leach's actions in authorizing the payments could be characterized as those of a director in that position. There were,

in addition, a number of other transactions by which monies were transferred from GFC to related corporations. Because of the monetary limit of the bond, the court found it unnecessary to pass upon whether these transactions qualified as losses within the meaning of the bond. Rather, it reversed the district court and entered judgment for the full amount of the bond in favor of the claimant based upon the advancements GFC made to pay Dakota Underwriters' debts and upon the improper payments of dividends to GFC's shareholders.

Here we think it appropriate to pause and restate some of the fundamental tenets of state corporate law, in addition to the principles stated in *General Finance*, that govern in a situation such as that involved in the present case. The bird's-eye view of the corporate network that the diagram reproduced in footnote 1 affords must not be allowed to obscure the individual and independent roles each particular corporation played vis-a-vis the general public. The companies and the individuals with whom each insured corporation in this network dealt perceived the corporation as standing alone. Farmers seeking to insure their crops dealt with the hail pool manager as a trusted intermediary between them and the insurers underwriting the risk; they did not perceive it as simply another mask worn by an "alter ego" named F. Wylly Clarke. The same is true of those firms dealing with the reinsurance broker who sought to reallocate the risks they underwrote. Indeed, certain third parties went so far as to inquire of Fidelity, through Clarke, as to whether the fidelity bond covered the monies held in trust for them, and were informed by Fidelity, again by a letter to Clarke, that these monies were covered by the bond.

This is not the place to catalogue the many and varied instances in which courts of equity have disregarded the corporate form—pierced the corporate veil—except to note one unifying principle: the corporate form will be disregarded when not to do so would work an injustice upon innocent third parties.

Here, innocent third parties dealt with each individual corporation in reliance upon, rather than in ignorance of, the distinctive corporate identity of each. Here, therefore, to disregard these distinctive corporate identities would work the very injustice the principle is intended to avoid. As this Court has noted:

> Courts are reluctant to pierce the corporate veil and destroy the important fiction under which so much of the business of the country is conducted, and will do so only under such compelling circumstances as requires such action to avoid protecting fraud, or defeating public or private rights.

*Maule Industries v. Gerstel*, 5 Cir. 1956, 232 F.2d 294, 297.

Another principle that is fundamental to the achievement of a just result in the present case is that no disbursement relied upon by the claimants in their submission of claims may be regarded as "legitimate" within the mandate of our earlier opinion if it was made in contravention of state corporate law. In certain instances, state statutory law should afford a clear guide to the district court in making its determinations of legitimacy. Florida law governs USAFORM, New York law governs Limited, and Delaware law governs Pan-Am. State business corporation statutes typically proscribe certain distributions in the form of dividends or otherwise that have the effect of impairing the capital of the corporation. Florida law, Fla.Stat.Ann. § 608.52, permits payment of dividends to shareholders only from the net earnings of the corporation or from the surplus of assets over the liabilities. Fla. Stat.Ann. § 608.54 prohibits the directors from making any distribution to shareholders which would decrease the capital of the corporation, except as permitted under Fla.Stat.Ann. §§ 608.52, 608.16. No distribution of capital is permitted that would have the effect of reducing the assets of the corporation below the amount of its liabilities. Fla.Stat.Ann. § 608.18(6). Similarly, New York law prohibits any declaration of dividends or any distribution of assets to shareholders

unless after such declaration or distribution the remaining assets are at least equal to the aggregate liabilities of the corporation. 58 McKinney's Consolidated Laws of New York, Stock Corporation Law, § 58. The Delaware General Corporation Law, § 170, permits the payment of dividends only out of surplus as defined by §§ 154, 242, 243, and 244 of the statute, or out of the net profits for the fiscal year in which the dividends are declared.

■ The district court in its earlier opinion found that "the named insureds were *all insolvent at all times* when the . . . illegal transfers were being made . . . ." 318 F.Supp. at 1308 (emphasis added). Because the only issue on remand from our 1972 decision was whether the wrongfully appropriated funds were used to pay legitimate corporate obligations, this finding—indeed, all findings and conclusions of the district court in its first opinion not germane to the issue on remand—were binding upon the district court. *See, e. g., Gulf Coast Building & Supply Co., Inc. v. International Brotherhood of Electrical Workers, Local No. 480, AFL–CIO,* 5 Cir. 1972, 460 F.2d 105.

■ State common law also affords standards by which the district court must judge the legitimacy of the disbursements that are the basis of the claims involved in this case. In this regard the following finding of fact made by the district court in its first opinion, 318 F.Supp. at 1310, is important:

. . . except for Clarke, there were no real officers of these corporations as that term is understood. He was the Alpha and Omega of the named insured corporations. His employees who held various titles, and thus were officers in name only, exercised no authority but simply did Clarke's bidding. He set the policies, he issued the orders, he made the decisions. He would brook no disagreements. While his subordinates grumbled among themselves about his actions, there was no open revolt because

it was apparent that it was either "vote aye or resign." He would squelch any dissent by reminding his "officers" that he was the boss—that these were his companies—and that he would decide how the money would be spent.

This finding is unaffected by the 1972 opinion of this Court. 463 F.2d 4.

In certain respects these facts found by the district court resemble those in *Geddes v. Anaconda Copper Mining Co.,* 1920, 254 U.S. 590, 41 S.Ct. 209, 65 L.Ed. 425. The district court in its second opinion erroneously held that *Anaconda* had no application because in the present case no stockholder had attacked any of the transactions involved, whereas in *Anaconda* minority shareholders had done so. In *Anaconda,* all of the assets of a certain company were sold to the Anaconda Copper Mining Company. All corporate formalities were properly observed. The Supreme Court noted that one individual at the time of the sale was the president and a director of the acquired company and also a director and general manager of Anaconda Copper. He "dominated the conduct of the practical administration of the affairs of [a third company involved in the case] and Anaconda . . ., and . . . he very certainly was in control of the boards of directors of the companies which were parties to the sale of [the assets of the acquired company]." 254 U.S. at 599, 41 S.Ct. at 212. The Court, in upholding the district court's finding that the consideration by the Anaconda Company to acquire the assets was inadequate, relied upon the following principles of law:

The relation of directors to corporations is of such a fiduciary nature that transactions between boards having common members are regarded as jealously by the law as are personal dealings between a director and his corporation, and where the fairness of such transactions is challenged the burden is upon those who would maintain them to show their entire fairness

and where a sale is involved, the full adequacy of the consideration. Especially is this true where a common director is dominating in influence or in character. This Court has been consistently emphatic in the application of this rule, which, it has declared, is founded in soundest morality, and we now add, in the soundest business policy. [Citations omitted.]

254 U.S. at 599, 41 S.Ct. at 212.

*Anaconda* was, of course, decided before *Erie*, but it has been relied upon by many state supreme courts. We have found no Florida case adopting these principles just quoted explicitly, but Fidelity has not countered the claimants' assertion that the *Anaconda* principles apply to the corporations involved in this case. The full implications of applying those principles to the present case may be further developed on remand.

Similarly, the district court erroneously held that *Pepper v. Litton*, 1939, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281, had no applicability to the facts before it because *Pepper* "involved a scheme in fraud of creditors" whereas the present case involved, at that stage of the proceedings, only the question whether certain corporate disbursements were for legitimate corporate purposes. The principles relied upon by Mr. Justice Douglas in *Pepper* are vital and relevant. Mr. Justice Douglas noted the following "cardinal principles of equity jurisprudence" :

A director is a fiduciary. [Citation omitted.] So is a dominant or controlling stockholder or group of stockholders. [Citation omitted.] Their powers are powers in trust. [Citation omitted.] Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. [Citation omitted.] The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. [Footnote omitted.] If it does not, equity will set it aside. . . . [T]hat standard of fiduciary obligation is designed for the protection of the entire community of interests in the corporation . . . . [Footnote omitted.]

308 U.S. at 306–307, 60 S.Ct. at 245. Again, although Fidelity has not challenged the claimants' reliance upon *Pepper* as a fair statement of principles governing such transactions under Florida, New York, or Delaware law, the full implications of the case may be developed on remand.

With these observations in mind, we now turn to an analysis of the validity of the district court's determinations regarding each of the specific claims presented to it upon remand. At the outset, we note that many of the claims advanced at the original trial were abandoned in the proceedings upon remand because, as counsel note in their brief, the claimants felt that it was impossible to demonstrate with respect to those claims an actual loss, as defined in our earlier opinion, to the particular corporation involved. We proceed to examine the district court's findings with respect to each claim renewed by the claimants on remand.[3]

## CLAIMS ASSERTED BY USAFORM

1. *Payment of 1961 pool debts of Inc. by USAFORM in the amount of $170,467.18.*

The district court found that "by formal contract ratified and approved by [USAFORM's] board of directors . . . [USAFORM] assumed all liabilities and obligation of [Inc.], including the 1961 Hail Pool debts." The district court went on to hold that the

---

**3.** The opinion of the district court on remand after our 1972 opinion is not reported. As noted, the first opinion is reported at 318 F.Supp. 1301.

debts, once *assumed* by USAFORM, were "legitimate". The court did not adequately address the question whether the assumption of the debts by USA-FORM was proper. None of the parties contends that the debts paid by the funds transferred by USAFORM were not legitimate debts. They clearly were legitimate debts *of Inc.* The crucial question is whether USAFORM's assumption of the debts was legitimate.

The "assets" of Inc. before the transfer involved here took place consisted of a debt owed the corporation by Clarke of $115,000, and other assets of $110,000, for a total of $225,000. The liabilities outweighed these "assets" by $50,000. They consisted primarily of debts due to creditors of the 1961–1962 Hail Pool Inc. which they had been managing, and they exceeded $275,000. After the transaction involved here, Inc. "retained" the $115,000 debt owed by Clarke. It transferred the assets of $110,000 and its liabilities, which had grown to $285,000, to the newly formed USAFORM, and it then became inactive. The claimants argued below, and argue here, that the net effect of this transfer was that funds held in trust were wrongfully appropriated to finance an opening deficit in USAFORM, and that Clarke's debt of $115,000 to Inc. was "washed out" by payments made to Inc.'s former creditors from funds now held by USAFORM. In other words, the balance sheet of Inc. after the transaction would show as an "asset" the $115,000 debt due from Clarke, and would show no liabilities owing to creditors on the liabilities side. USAFORM's balance sheet after the transaction would initially show assets of $110,000 and liabilities in excess of $285,000. In its first opinion, 318 F.Supp. 1301, the district court found that all the corporations involved here were insolvent at all relevant times. In light of that fact, and in light of his findings with respect to the dominant—even domineering—role played by Clarke and the clearly dishonest and fraudulent invasions of monies held in trust for others of which Clarke was guilty, we believe that the district court focused on the

wrong question. In the third paragraph of its finding on this transaction, it notes that there was no evidence of a dishonest or fraudulent act in paying the 1961 pool debts that USAFORM had assumed. Apparently it did not scrutinize the contract by which the transaction was consummated in the first place, other than to note that the contractual formalities had been observed. On remand, it must reconsider this assumption of assets and liabilities from the point of view of each corporation involved, and it must specifically determine whether each satisfied a legitimate corporate obligation in undertaking the transaction. The district court made no findings on the adequacy of the consideration for the assumption of the assets and liabilities, a question highly relevant to the legitimacy of the assumption itself. Finally, because this Court earlier affirmed the district court's findings with respect to fraudulent invasions of trust funds, we think it appropriate to impose upon the party seeking to rely upon the legitimacy of the transaction the burden of proving it, in accordance with *Anaconda* and *Pepper.*

2.  *Advance of $14,000 to Halifax Insurance Agency by USAFORM.*

██ The district court found that USAFORM, by a check drawn upon its general account, advanced $14,000 to Halifax Insurance Agency, and described the payment on its books as an "advance". The district court characterized Halifax as an "affiliated corporation", and noted that it had been a joint insured on the bond, and that it had produced "some business for other Clarke corporations". Clarke owned 50 percent of the stock of Halifax, but its business appears to be otherwise unrelated to USAFORM, whatever might be said of its relationship with still other "Clarke corporations" mentioned by the district court. The district court noted that the "advance" was "necessary to keep Halifax afloat". Nowhere, however, does the district court address the question whether it was a legitimate corporate obligation *of USAFORM* to keep Halifax afloat. The district judge relied also on

the fact that Clarke had "discussed the situation with several of the directors". In light of his findings, quoted above and affirmed in our 1972 opinion, regarding the dominant position of Clarke, that fact can have little weight in assessing the validity of the "advance".

The district court seems to have been impressed by the argument that "if one member of the corporate complex failed, it would cause the other members to fail, and that too, would ruin any chances of selling [USAFORM]". That may or may not be the case, but the effect on the corporate complex is irrelevant. The inquiry should have been whether this particular advance fulfilled a legitimate obligation owed by USAFORM to Halifax. Under *Anaconda* and *Pepper*, the burden of proving the legitimacy of this sort of intercorporate transfer is, in the circumstances of this case, on the party that relies upon that validity to escape liability on the bond, namely, Fidelity. The district court erroneously placed the burden upon the claimants. The court noted that there was no evidence to show that [USAFORM] was prohibited by either its by-laws or its charter from making the loan or advance to Halifax. This disregards completely the state statutory prohibitions against impairment of capital and against payments (however disguised) of dividends to shareholders unless the statutory preconditions are met, and it disregards the state common law regarding the heavy burden of proving the utmost fairness in transactions between a corporation and one of its directors or in transactions involving a director's corporation and inuring to his benefit. What happens to other corporations in the "network" should be of no concern to the district court in approaching this question. Rather, the court should focus only upon USAFORM and whether it had a legal obligation to advance the $14,000.

3. *USAFORM's advances to Limited in the amount of $63,331.10.*

▮ The district court found that Limited's balance sheet as of December 31, 1962, reflected "advances" it had received from USAFORM in the amount of $63,331.10. The district court noted that "there were reciprocal advances between [USAFORM] and Limited in 1962. The practice of reciprocal advances between the affiliated corporations was a form of mutual assistance which was of long standing, and it was not wrong per se." First, this broad proposition is at odds with the principles embedded in the statutory and case law we have already discussed. The district court attempted to bolster its analysis by noting that all of the intercorporate transactions were plainly noted upon the books, and appeared in audits conducted by certified public accountants. The court said that "concealment is the badge of fraud. Any person who perpetrates a fraud on another does not make an open record of that fact." But lack of "concealment" does not automatically transform an "advance" that appears at best to be questionable into one made to meet a legal obligation of USAFORM. Moreover, here as elsewhere, the district court tended to confound the issue whether there had been fraud and dishonesty with the issue whether the wrongfully appropriated monies were applied to a legitimate corporate obligation. We repeat that the court's earlier findings of fraud and dishonesty were affirmed by this Court in its 1972 opinion and were not open to reconsideration on remand.

The district court further noted that there was no evidence that Clarke received any personal benefit from the advance to Limited. Whatever the legal significance of this finding, it appears to be clearly erroneous, because Clarke was the sole shareholder of Limited, Limited was insolvent, and Limited received the $63,331.10. It is possible that this transaction (and others discussed here as well) might be characterized *both* as payments to corporations that had no legal claim to payment and as payments that redounded to the personal benefit of directors or officers.

▮ Another shortcoming of the district judge's analysis of this claim was

his disregard of the insolvency of the corporations. As we have noted above, the insolvency of a corporation *may* make illegitimate disbursements that otherwise might be legitimate, depending upon state statutory and common law. Because Fidelity relies upon the propriety of Clarke's actions, the burden on remand is on Fidelity to demonstrate the propriety of the advances, since Clarke was, under *Anaconda* and *Pepper*, a fiduciary in a position fraught with possibilities of conflict of interest. On remand, then, the district court will determine whether USAFORM, an insolvent corporation, owed any legitimate obligation to Limited to make the advance of $63,331.10.

The transfer here was effected by an assignment to Limited by USAFORM of premium monies due to USAFORM. In this respect, the transaction is similar to that involved in *Duel v. National Surety Corp.*, E.D.Wis.1945, 64 F.Supp. 961. In the 1972 appeal of this case, we referred to the facts of *Duel* as follows:

> The insured under the fidelity bond was an insurance company. Its general agent caused premiums due to be assigned to a corporation which was under his control. Thus the premium money went not to pay legitimate debts of the insured company, but into the pockets of the double-dealing employee.

463 F.2d at 7. The district court should give due regard to *Duel* in considering this claim upon remand.

Finally, we should note that we do not understand the meaning of the phrase "reciprocal advances between [USAFORM] and Limited" as used in paragraph 2 of the district court's finding on this claim. Our confusion is not diminished by the district court's later reference to "reciprocal advances" as "clearly debit and credit transactions between the insured". Neither term has any *a priori* legal significance, and, if the district court pursues this line of analysis again upon remand, it should state its findings of fact more fully.

**4.** *Payment by USAFORM of debenture to Clarke in the amount of $10,000.*

The district court found that USAFORM was organized in 1961 with $100,000 worth of capital consisting of 400 shares of common stock, all of which Clarke owned, and that Clarke paid into the corporation $100,000 which he had borrowed from a bank, pledging the stock as security. USAFORM also issued debentures with a face value of $100,000 which were sold at a discount to Clarke for $94,200, which amount he borrowed from two banks, pledging the debentures as security for the loan. In July 1962, USAFORM issued a check in the amount of $10,000 to Clarke to pay one of the $10,000 debentures which had become due according to its terms. On the same date, the district court found, Clarke paid one of the banks holding the pledged debentures $10,000 drawn on his own account to redeem the debenture in question, and then returned it to USAFORM. USAFORM carried this debenture on its books as an "asset". The district court noted that the debenture was a legitimate corporate obligation. Its decision on this claim, however, was apparently influenced by the language in the 1972 opinion relating to insolvency, for it noted that "[USAFORM] could not recover on the bond for the $10,000 payment if it were solvent". On remand, the district court should consider whether USAFORM, as an insolvent corporation, could, under the state business corporation law regarding redemption of securities and debentures and reductions in capital, lawfully have redeemed the debenture.

**5.** *Two payments by USAFORM to Clarke amounting to $2,450.*

The district court noted that the parties stipulated that two checks totalling $2,450 were issued personally to Clarke, and were charged on USAFORM's books to "travel and entertainment expense". The district court noted that Clarke himself testified without contradiction that "he did a great deal of travelling in

quest of business". The court then noted in rather abstract terms that generally speaking "travel and entertainment expense, incurred in quest of business, is a legitimate corporate business expense". Because, however, the rest of the findings seem to have been influenced by an erroneous view of the mandate of our 1972 opinion, we feel the better part of justice is to vacate this portion of the judgment as well, and remand for a more specific finding that these disbursements made by USAFORM were in payment of legitimate corporate obligations incurred on account of travel and entertainment undertaken for the benefit of USAFORM, and not for some other corporation in the Clarke empire.

### CLAIMS ASSERTED BY LIMITED

1. *Limited's advances to Pan-Am in the amount of $237,361.44.*

The district court noted that Limited's balance sheet as of December 31, 1962, showed as an asset the $237,361.44 owed to it by its insolvent subsidiary Pan-Am. The court further observed that a certified public accountant, in auditing the books after the collapse, "listed payments by Limited to Pan-Am over a three-year period, aggregating an amount in excess of the amount claimed, which would indicate that there were reciprocal debits and credits between Limited and Pan-American, with the net account receivable being shown on the balance sheet, which Limited carried as an asset." As we noted earlier in our discussion of the claim based on USA-FORM's advances to Limited in the amount of $63,331.10, "reciprocal debits and credits" is a phrase that, without more, has no legal significance, and in fact does little to clarify what actually happened even as a matter of bookkeeping. If on remand the district court again pursues this line of analysis, it should make findings of fact that are more explicit on this point.

Proceeding in its analysis, the district court found that Limited purchased all the stock of Pan-Am's prede-cessor in name in 1959, so that Pan-Am became a wholly owned subsidiary of Limited, and that Pan-Am engaged in the same reinsurance brokerage business as Limited, except that Pan-Am operated in South America. The evidence disclosed that "in 1960, 1961, and 1962, Limited drew checks on its premium account . . . to the order of Pan-American . . .." The district court said that this, without more, was insufficient to show fraud. Again, the district court confounded the fraud issue with the issue whether the particular insured corporation made a disbursement to satisfy a legitimate obligation it owed to a third party. The district court already found, and this Court approved its finding in its 1972 opinion, that the funds used in these transactions were fraudulently and dishonestly diverted from their proper accounts. The only issue remaining is whether the obligation to which the wrongfully appropriated money was applied was legitimate. Moreover, the district court again referred to the question of insolvency as if it were irrelevant to the question of the legitimacy of the obligation paid by Limited here. The court also appears to have lumped parent and subsidiary together for purposes of determining the legitimacy of the payments, for it noted "that the advances to Pan-American went to pay the overhead and operating expenses chargeable to Pan-American for bookkeeping purposes." The court was also impressed by the fact that the books of Limited showed accounts receivable from Pan-Am and that Pan-Am's books showed accounts receivable payable to Limited. Its observations on this score suggest that it did not regard Pan-Am and Limited as separate and distinct corporate entities, but, on the contrary, pierced the corporate veil—not to prevent injustice to innocent third parties, but rather to effectuate it. Here, again, the district court placed the burden on the claimants to prove "fraud and dishonesty". The real question was the legitimacy of the obligations covered by the disbursements, and, under *Anaconda* and *Pepper*, in the circumstances of the present case

the burden of showing that legitimacy is upon Fidelity because Fidelity relies upon that legitimacy to protect it from recovery on the bond it wrote.

The claimants argue that before the acquisition of Pan-Am by Limited, Pan-Am had no assets and it had liabilities of approximately $1,000,000. Limited, on the other hand, had assets of $237,000, and an equal amount of liabilities due to underwriters. After the acquisition and the transfers in question Pan-Am had the same amount of liabilities except that it had paid its old creditors the $237,000 advanced to it by Limited, and therefore owed the $237,000 to its parent corporation, rather than to its former creditors (who, one might suppose, would be considerably more zealous in pursuing their debtor than Limited). The claimants contend that New York law prohibited the advance of the $237,000 cash from Limited to Pan-Am. Nowhere does the district court address this contention, perhaps because of its erroneous view that insolvency was irrelevant to the legitimacy of a corporate disbursement. On remand, it must address the question whether, under New York law, Limited had a legitimate obligation to advance the $237,361.44 to Pan-Am.

2. *Account receivable due from Clarke in the amount of $33,163.52.*

The district court found that, according to Limited's balance sheet of December 31, 1962, Clarke owed the corporation $33,163.52. The court said: "On its face, the account receivable is a debit and credit transaction between Clarke and Limited. There is no coverage under the bond for debit and credit transactions." We have noted before that the characterization of a transaction as "debit and credit" is not helpful, without more, in determining the legitimacy of a particular disbursement. Our earlier observations apply with equal force to this finding of the district court. The court discussed in some detail the debts Clarke owed to the various corporations. With respect to a cumulative Clarke debt of $150,000, the court noted that "Clarke testified that the purpose of the loans

was to pay income taxes. Stebler [an officer of Limited] testified that the account receivable on Limited's books represented advances to Clarke over a period of time." Nowhere, however, does the district court discuss what legitimate corporate obligation was owed to Clarke that would explain the entry on Limited books of a debt owed by Clarke in the amount of $33,163.52. The court summarizes some of the testimony of some of the officers to the effect that they were unaware that Clarke was committing any acts of impropriety against the corporations, but this testimony is only relevant to the knowledge and notice issues in the case, already decided against Fidelity, 318 F.Supp. at 1310, and affirmed in our 1972 opinion. Its discussion erroneously shifts in focus from the *specific* debt to Limited involved here to Clarke's *overall* indebtedness to *all* of the corporations he controlled. The court also erroneously relied on the absence of proof of "fraud and dishonesty" with respect to the specific claim in issue here, and it made the same apparent assumption regarding insolvency we have criticized in our treatment of other claims. The burden here, as in the case of the other claims we have discussed, is on Fidelity to demonstrate the legitimacy of the "loan" to Clarke. On remand the district court should focus upon what legal obligation Limited owed to Clarke that would account for the $33,163.52 entry on its books.

3. *Loan receivable on Limited's books in the amount of $10,145.90.*

■ The district court found that a loan in the amount of $10,145.90 was carried on Limited's books. It noted, however, that "there is no evidence to show when or how the loan originated, to whom it was made, or that it was made to an employee of Limited. In any event, it was carried on Limited's books as an asset, which is the opposite of a loss." We attach no significance to this last observation of the district court, for any amount of money owed to a corporation by any party will be carried on its

books as an asset. Moreover, an illusory "asset" is not necessarily the "opposite of a loss".

The district court held with respect to this claim: "There is no evidence to show any factual basis for the bald, conclusory assertion that the loan receivable is a fraudulent diversion of Limited's funds to the personal use of an employee." On the contrary, it appears that there *was* evidence regarding the nature of the loan and the identity of the borrower. As claimants note in their brief, "in addition to appearing as a 'loan receivable' on the December 31, 1962 balance sheet of Limited, this identical amount also appears on the December 31, 1962 balance sheet prepared by Norman Reitman as due from an employee, H. A. Stebler. The account prepared by Norman Reitman listed this loan under 'due from stockholder, H. A. Stebler', because Stebler had formerly been a stockholder of that corporation." We therefore cannot agree with the district court's finding that there was "no evidence" that the payment did not satisfy a legitimate corporate obligation. Furthermore, the district court, in the third paragraph of its findings with respect to this claim, again appears to have been influenced by a misapprehension of the import of our language regarding insolvency in the 1972 opinion. We must therefore vacate this portion of the judgment. On remand, the district court must address the question whether the loan was made to fulfill a legitimate corporate obligation owed by Limited to Stebler.

4. *Limited's advance to International in the amount of $1,333.84.*

■ The district court found that Limited drew a check on its premium account payable to USAFORM International, Ltd., in the amount of $1,333.84. Here, again, the district court denied recovery on the bond because "fraud and dishonesty" had not been proved with respect to this payment. The court also indicated that the insolvency of Limited was irrelevant. Because we think it mis-

apprehended the mandate both on the issue of fraud and on the question of insolvency, we must vacate this portion of the judgment and remand for specific findings on the question whether this disbursement by Limited went to satisfy a legitimate obligation it owed to International. We do not agree that there is "no evidence in the record" to show that the check was not in payment of a legitimate account owed to International. As the claimants note in their brief, there *was* evidence—"the unrefuted testimony of Stebler . . . that International was a dormant corporation which in its entire existence had only earned a few hundred dollars." This evidence makes the transaction appear at least questionable, and the district court should pursue the question further on remand.

## CLAIMS ASSERTED BY PAN–AM

1. *Pan-Am's advances to Clarke and Stebler in the amount of $11,600.*

The district court found that there were 21 checks drawn by Pan-Am on its premium account and made payable to Clarke and Stebler, amounting in the aggregate to $11,600. The district court reasoned:

There is no evidence whatever to show the purpose of the payments. The payments are not charged on Pan-American's records to Clarke and Stebler personally. In light of the meticulous entries of all advances kept by the three corporations [claimants], the absence of any charges of the payments to Clarke and Stebler strongly indicates that the payments were for legitimate purposes.

The district court compounded the confusion by noting that "the uncontradicted evidence further shows that the payments now complained of are included in Limited's advances to Pan-American to enable Pan-American to pay its share of the overhead and operating expenses." We have already discussed the district court's findings relating to these advances by Limited to Pan-Am, and have determined that that claim must be re-

considered on remand. The fact that the checks involved in *this* claim were drawn on those funds advanced by Limited can give no support to the result the district court reached on this claim. On remand, the district court must determine whether these payments to Clarke and Stebler were in satisfaction of legitimate corporate obligations owed to the two men, bearing in mind their special status as officers and directors, and, in the case of Clarke, controlling shareholder. Here, again, since Fidelity relies upon the legitimacy of the payments to protect it from recovery, it has the burden of demonstrating that legitimacy.

2. *Pan-Am's advances to International in the amount of $16,800.*

The district court found that 11 checks totalling $16,800 were drawn by Pan-Am on its premium account and made payable to International. Once again, the district court seems to have relied on the fact that these advances to International came out of monies already legitimately advanced to Pan-Am by Limited, in itself a question that must be reconsidered on remand. Thus, the court said, "Pan-American was no more than a mere conduit through which Limited paid International's overhead and operating expenses." The district court obviously overlooked the question whether Pan-Am (or, for that matter, Limited) had any legal obligation to pay International's overhead and operating expenses in Zurich. Its judgment with respect to this claim must, therefore, also be vacated. On remand, the court should make findings regarding the legitimacy of the obligations to International the payments made by Pan-Am were intended to satisfy.

\*   \*   \*   \*   \*   \*

The district court has acted conscientiously and has taken great pains throughout the course of this litigation. Our examination of the record leads us to conclude, however, that the court misapprehended the mandate of the 1972 opinion of this Court. Regretfully, we vacate the judgment of the district court, and remand the cause for still further proceedings in conformity with the views here expressed.

Vacated and remanded.