**In re LEEDY MORTGAGE CO., INC., Debtor.**

**John P. JUDGE, Trustee, Plaintiff,**

**v.**

**Steven James BURNHOPE, Excess Insurance Co., Ltd., English and American Insurance Co., Ltd., Bankers Insurance Corp., Bellefont Insurance Co., Nippon Insurance Co., Ltd., Defendants.**

**Bankruptcy No. 83–03502K.
Adv. No. 84–1168K.**

United States Bankruptcy Court,
E.D. Pennsylvania.

July 24, 1987.

See also, D.C., 62 B.R. 303.

David S. Fishbone, Philadelphia, Pa., for trustee/plaintiff.

Charles C. Hileman, III, Philadelphia, Pa., for Stephen James Burnhope, Underwriter of Lloyds.

Robert R. Reeder, Philadelphia, Pa., for Bankers Ins. Corp.

Marvin Krasny, Philadelphia, Pa., for debtor.

John Judge, Philadelphia, Pa., trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION AND PROCEDURAL HISTORY

The instant adversarial proceeding is an action by the Trustee of a Debtor mortgage company to recover, originally, compensatory damages of over $14 million and punitive damages of $50 million against the underwriters and the sales agent on two fidelity bonds as the result of certain fraudulent conduct of the Debtor's President and major shareholder, Richard Micheel, and certain other high-level employees of the Debtor. Presently before us is a Motion by the underwriter Defendants for summary judgment as to eleven of the twelve separate Claims identified by the Plaintiff, which embrace all but an employee theft loss of $5,377.27.

We believe that in a case where the facts are so complex and which involves a Motion for summary judgment by an insurer, against which all ambiguities in the policies must be construed, we must deny the Motion as to all claims concerning which we have any reasonable doubt as to the merits. This causes us to grant the Motion entirely as to only three of the eleven Claims (Claims 6, 7, and 12), regarding which we are convinced that the Trustee could not possibly assert a successful cause of action. Further, we indicate that the other Claims must either be reduced in amount from the amount originally stated by the Trustee to be in issue (Claims 2, 3, 4, 9, and 11) or that they can be maintained successfully only if considerably more evidence than was revealed to date can be proven (Claims 1, 8, and 10). However, we do support the viability of the eight remaining Claims in general. We therefore grant the Motion in part only, hoping that our extended discussions herein will spur a complete resolution of the matter. In the event that it does not, we include a Pre-Trial Order within our Order attached hereto.

The parties, while submitting voluminous Briefs,[1] provide therein very little in the way of a procedural history of this proceeding, which was originally filed on August 28, 1984, almost to the day two years before the undersigned was appointed to the bench. We will attempt to reconstruct the procedural history briefly as the result of our perusal of the Docket Entries and file.

On October 31, 1984, the Trustee filed his First Amended Complaint which, to our knowledge, has never been subsequently amended and remains as the present statement of the Trustee's causes of action. The five underwriter Defendants, all of the Defendants except BANKERS INSURANCE CORPORATION, (hereinafter referred to as "Bankers"), filed a joint Answer on November 6, 1984. Bankers, alleged to be the agent that sold the insurance to the Debtor, filed a separate Answer on the same day.

It appears that the next two years were consumed with discovery, and Motions to

---

1. The Movant's Opening Brief was fifty (50) pages in text and included, in addition, thirteen exhibits. The Trustee's Brief was thirty-two (32) pages in text and also included an Affidavit from his accountant and ten exhibits, many of which are themselves sizable. The Movant responded with a Reply Brief which is forty-seven (47) pages in length and includes two additional exhibits.

compel discovery, which were continuously filed, scheduled for hearings, which were often continued, and, apparently, all ultimately resolved. It is difficult to judge what progress was made towards resolving the substance of the matter or moving it along to trial during this period. The first time that the matter surfaced after the undersigned's appointment to the bench on August 27, 1986, was on January 7, 1987, when the matter came before us on the Trustee's Amended Motion to compel certain discovery from the underwriter defendants. We directed the parties to promptly file Memoranda relating to that matter in order that we could resolve it.

However, almost immediately thereafter, we were advised that this discovery matter had been resolved and that the parties desired a conference call on the status of the merits of the case.

In the course of that conference call, conducted on March 2, 1987, the underwriter defendants, at least in the person of Defendant STEPHEN JAMES BURNHOPE,[2] indicated that they had already prepared and intended to file a Motion for Summary Judgment. Counsel for Bankers indicated that it might do so as well. We therefore sent out an Order of that date directing that any Summary Judgment Motion in the matter must be filed on or before March 9, 1987; that the Trustee should remit any responsive Motions or Briefs on or before April 10, 1987; and that the Moving Parties could respond on or before April 20, 1987. Ultimately, only Burnhope filed such a Motion, with his opening Brief, on March 4, 1987. The Trustee filed his Reply Brief on April 10, 1987; and Burnhope requested and was granted until May 1, 1987, to file his Reply Brief, when he did so.

Since the matter before us is a Motion for Summary Judgment, we need not and cannot make Findings of Fact. However, we will begin by setting forth a few general facts and allegations pertinent to the case necessary to give shape to our legal analysis. Then, we shall proceed, at the outset, to set down our view of the criteria for resolving Motions for Summary Judgment pursuant to Bankruptcy Rule (hereinafter referred to as "B. Rule") 7056 and Federal Rule of Civil Procedure (hereinafter referred to as "F.R.Civ.P.") 56. We will then consider several principles regarding interpretation of insurance contracts generally which we deem pertinent to our analysis. Next, we shall proceed to discuss the issues of law relevant to interpretation of the fidelity bonds in question which Burnhope raises i.e., (1) What constitutes a "loss" for "personal gain" under such a policy? (2) Are actions by Richard Micheel covered under the policies? and (3) Does the Trustee have standing to maintain this action, particularly when it is alleged by Burnhope that most of the losses were incurred by investors or creditors of the Debtor?[3] After we have answered these questions, we will apply our analyses to the particular facts of the eleven separate Claims in issue.

## B. GENERAL FACTS

At the outset, we shall quote the identical paragraph one of both Certificates of

---

**2.** Defendant BURNHOPE has apparently been designated by the Underwriters at Lloyds of London, the principal insurers, as their agent for defense of this suit. We note that, although a joint Answer was filed on behalf of all of the underwriter defendants, several of the pleadings filed on behalf of these parties, most notably the Motion before us, have nominally been filed solely on behalf of Burnhope. The significance of this apparent discrepancy is not explained in the papers submitted to us. We assume that Burnhope and his counsel are in fact speaking for all of the underwriter defendants and that therefore references to him or to the underwriter defendants as a group are made interchangeably.

**3.** We recognize that Burnhope has identified six specific legal issues. However, we believe that the first three, whether the Debtor suffered a loss when monies were fraudulently used to pay corporate obligations, whether the Debtor's liability to third parties constituted a loss, and whether the Debtor's employees committed fraud with the intention of personal gain, are inter-related. We also believe that the issues of whether investors and creditors have any rights under the policies and whether the Trustee has standing to raise such rights are also inter-related, and we consider them together as well.

Insurance, one of which covered the period from December 22, 1979, to December 22, 1982, and the other of which covered the period from December 22, 1982, to December 22, 1985, which provides for coverage from losses due to breach of fidelity by employees, as follows:

## THE LOSSES COVERED ARE THOSE SUSTAINED AS FOLLOWS:

### 1. FIDELITY

BY REASON of and solely and directly caused by any dishonest or fraudulent act of the employees of the Assured, as defined, committed with the manifest intention of making improper personal financial gain for themselves wherever committed and whether committed directly or in collusion with others, including loss of property through any such act of any of the employees, as defined. Salary, fees, commissions and other emoluments, including salary increases and promotions shall not constitute improper personal gain.

IT IS AGREED, however, that this insuring clause shall also indemnify the Assured to an amount not exceeding the Limit of Liability of this bond or $50,000, whichever is less, against loss by reason of any such act of attorneys who are retained by the Assured to perform legal services for the Assured and the employees of such attorneys while such attorneys or the employees of such attorneys are performing such services for the Assured.

"Employee" or "employees" as used in this Bond shall be deemed to mean

1. one or more of the Assured's officers, clerks and other natural persons in the regular service of the Assured in the ordinary course of the Assured's business and whom the Assured compensates by salary, wages or commissions and has the right to govern and direct in the performance of such service.

2. any natural person assigned to the Assured through an intervening employer or agency to perform the usual duties of any employee of the Assured on a contingent or part-time basis.

3. each natural person, partnership or corporation appointed by the Assured to act as its agent in the capacity of electronic data processor of checks or other accounting records of the Assured, while acting on behalf of the Assured or while in possession of money or other property belonging to the Assured or in which the Assured has an interest. Each such agent and the partners, officers and employees of such agent shall be, collectively, on Employee for all the purposes of this Bond, excepting, however, subparagraphs (1) and (2) of Condition L.

4. any natural person who is a director or trustee of the Assured while such director or trustee is engaged in handling funds or other property of any Employee Welfare or Pension Benefit Plan established and maintained by the Assured for the benefit of its employees or any natural person who is trustee, fiduciary, administrator, officer or Employee of any such Plan. It is agreed that the Deductible Amount applicable to loss sustained through acts or defaults committed by employees shall not apply to loss sustained by any Employee Welfare Pension Benefit Plan covered under this Bond through acts or defaults committed by any Employee of any such Plan.

We note that the Debtor, incorporated in the State of Alabama in 1977, filed the instant voluntary Chapter 11 case on September 7, 1983. The Trustee, Plaintiff herein, was appointed by our predecessor, the Honorable William A. King, Jr., on September 16, 1983. It appears that the Debtor did not conduct any business subsequent to the filing. We also note that Richard Micheel, who became the principal shareholder of the Debtor in October, 1979, is presently incarcerated, having been convicted of fraud in connection with some of the transactions in issue here. *See Baehr*

*v. Touche Ross & Co.*, 62 B.R. 793, 795 (E.D.Pa.1986).

The Trustee is faced with the unenviable task of piecing together the various schemes engaged in by Micheel and other high-level employees of the Debtor without, as might be anticipated, cooperation from these employees. Instead, this task has been accomplished by utilization of the services of a Certified Public Accountant experienced in bankruptcy matters, George L. Miller, and his firm. Mr. Miller's Affidavit informs us that he was appointed on September 30, 1983, and spent about a year thereafter examining the Debtor's books. Mr. Miller's general analysis of what occurred in connection with the Debtor's course of business is that its stockholders and officers borrowed substantial sums through the Debtor, on which they were personally liable, from the date of incorporation through October, 1979. When interest rates began to rise greatly in September, 1979, and these parties were faced with significant personal liability, most of the Debtor's stock was transferred to Micheel. However, these parties remained active in the business and worked with Micheel to attempt to liquidate the obligations on which they were personally liable. The general categories of conduct perpetuated by Micheel and these parties were the invasion of escrow accounts maintained for other specific purposes, pledging assets of the Debtor without consideration, multiple pledging of the Debtor's assets, and perpetuating transfers to other related corporations. In sum, a sufficiently shocking picture of pervasive fraud is presented that it shakes one's confidence in the mortgage industry.

Burnhope does not deny any of these factual allegations and attaches no Affidavit of his own stating any factual averments to his Motion for Summary Judgment. He argues, principally, that certain principles of law developed in the caselaw construing similar fidelity bonds, when applied to the testimony adduced from Mr. Miller in depositions taken on April 7, 1986, and April 16, 1986, establish, as a matter of law, that the Trustee cannot make out a case regarding any of the eleven of twelve fraudulent Claims concerning which he requests that summary judgment be granted.

## C. SUMMARY JUDGMENT MAY BE GRANTED AS TO ANY OF THE TRANSACTIONS IN ISSUE ONLY IF THE COURT IS CONVINCED THAT BURNHOPE MUST INEVITABLY PREVAIL THEREIN AS A MATTER OF LAW.

The Court of Appeals for the Third Circuit has set forth the standards to be applied in ruling on a summary judgment Motion, in an insurance case, as follows:

> Summary judgment may only be granted if, upon a review of the material properly before the court, *see* F.R.Civ.P. 56(c), and in viewing the evidence thus considered in a light must favorable to the nonmoving party, the court is convinced that no genuine issue of material fact remains for trial and that the movant is entitled to judgment as a matter of law. *Lang v. New York Life Ins. Co.*, 721 F.2d 118, 119 (3d Cir.1983).

*See also, e.g., Special Jet Services v. Federal Ins. Co.*, 643 F.2d 977, 980 (3d Cir. 1981); *Smith v. Fireman's Fund Ins. Co.*, 575 F.Supp. 69, 71 (E.D.Pa.1983); and *Blair v. Manhattan Life Ins. Co.*, 516 F.Supp. 759 (W.D.Pa.1981). *Cf. Reihl v. Travelers Ins. Co.*, 772 F.2d 19 (3d Cir. 1985) (summary judgment in favor of insured reversed where issue of liability depended on determination of certain facts).

The principal counter-argument articulated by Burnhope is that the Supreme Court "breathed new life" into the use of F.R.Civ.P. 56 in its decisions in *Celotex Corp.*, 477 U.S. 317, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986), where the Court stated that summary judgment is not to be regarded as "a disfavored procedural shortcut." However, in that case, the Court merely held that the Court of Appeals, in reversing a trial court award of summary judgment, erred in not requiring the nonmoving party to produce any materials indicating that factual disputes exist in response to a summary judgment motion not itself accompanied by an affidavit. Neither this case, nor the other Supreme Court

cases cited by Burnhope, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2509–12, 91 L.Ed.2d 202 (1986) (reversal of Court of Appeals holding that actual malice can never be established on motion for summary judgment in defamation case); and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1355–57, 89 L.Ed.2d 538 (1986) (at least some evidence of illegal competition must be established to avoid summary judgment in anti-trust case), break any new ground or suggest any significant changes in consideration of motions for summary judgment which are relevant to this case. As the Court instructs in *Celotex,* we are not excusing the Trustee from establishing that factual issues remain of record sufficient to require denial of Burnhope's Motion simply because Burnhope has attached no affidavit to his Motion.

Hence, we do not believe that these Supreme Court decisions effect any substantial change in the interpretation of F.R. Civ.P. 56. *See, e.g., Sorba v. Pennsylvania Drilling Co.,* 821 F.2d 200, 202–03 (3d Cir., 1987) and *Tigg Corp. v. Dow Corning Corp.,* 822 F.2d 358, 361–62 (3d Cir.1987). The law remains as the above cases hold and we have stated in *In re American International Airways, Inc., Begier v. American Express Co.,* 74 B.R. 691, 696 (Bankr.E.D.Pa., 1987); and *In re H & H Beverage Distributors, Inc.,* 65 B.R. 243, 244–45 (Bankr.E.D.Pa., 1986):

> summary judgment [is] ... "a drastic remedy," and ... "courts are to resolve any doubts as to genuine issues of fact against the moving party" [quoting *Hollinger v. Wagner Mining Equipment Co.,* 667 F.2d 402, 405 (3d Cir.1981); and *Betz Laboratories, Inc. v. Hines,* 647 F.2d 402, 404 (3d Cir.1981)], [and] that "inferences to be drawn from the underlying facts contained in the evidential sources submitted to the trial court must be viewed in the light most favorable to the party opposing the motion." *Goodman v. Meade Johnson and Company,* 534 F.2d 566, 573 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

We also note, as we did in *American International Airways/American Express, supra,* at 694, the disadvantage under which a Trustee, appointed to succeed to a mismanaged business, often finds himself. This observation is particularly pertinent when the Debtor's employees are unlikely to cooperate with the Trustee for fear of criminal conviction and incarceration, which was the stopping place for Mr. Micheel.

Thus, we believe that Burnhope can succeed in his Motion on any particular Claim only if he convinces us that the Trustee has produced no materials, either in the depositions or the Affidavit of Mr. Miller, which could possibly support a judgment in favor of the Trustee as to that particular Claim. The standards which Burnhope must meet, therefore, to succeed on his Motion, are quite demanding.

## D. PERTINENT STATE LAW REQUIRES THAT ANY AMBIGUITIES IN THE INSURANCE CONTRACT IN ISSUE BE CONSTRUED AGAINST THE INSURER (BURNHOPE).

Prior to discussion of any of the substantive issues presented by this case, we observe that the parties have not, throughout their lengthy Briefs, presented us with any discussion of what state's law applies. Since we sit as a bankruptcy court in Pennsylvania, we generally would assume that Debtors are Pennsylvania-based, 28 U.S.C. § 1408, and that Pennsylvania law would be applied to the Debtor's transactions unless the parties contend otherwise. The Trustee's Affidavit also indicates that Mr. Micheel, the Debtor's chief executive officer, generally remained stationed in Philadelphia prior to his departure to prison.

However, we cannot overlook the fact that this particular Debtor is an Alabama corporation whose officers were apparently located, at all times during its life-span, in Birmingham, Alabama. Thus, the distinct possibility exists that we should apply Alabama law to determine the issues at hand. We note that the parties have not indicated to us, and we are not ourselves aware of, any instance significant to our determinations where the law of Pennsylvania and of

Alabama diverges. We are merely acknowledging that this may be an issue of some importance which we cannot resolve on this record.

In any event, the law of Pennsylvania, as interpreted by the state courts and the federal courts in deciding cases involving insurance coverage, is that

> because insurance policies are frequently considered to be contracts of adhesion, any ambiguity in the policy *"must* be construed against the insurer, and in a manner which is more favorable to coverage." *Houghton v. American Guar. Life Ins. Co.,* 692 F.2d 289, 291 (3d Cir. 1982) (*quoting Buntin v. Continental Ins. Co.,* 583 F.2d 1201, 1207 [3d Cir. 1978]).

*See also, e.g., Niagara Fire Ins. Co. v. Pepicelli, Pepicelli, Watts & Youngs, P.C.,* 821 F.2d 216, 220 (3d Cir., 1987); *Shishko v. State Farm Ins. Co.,* 553 F.Supp. 308, 312 (E.D.Pa.1982); *Wierbinski v. State Farm Mut. Auto. Ins. Co.,* 477 F.Supp. 659, 662 (W.D.Pa.1979); and *Weiss v. CNA,* 468 F.Supp. 1291, 1293 (W.D.Pa.1979). In decisions such as *Ranieli v. Mutual Life Ins. Co.,* 271 Pa.Super. 261, 413 A.2d 396, 400 (1979), the state courts have held that "it is well settled that insurance policies are in essence contracts of adhesion, and consequently, any ambiguities or uncertainties in language are construed strictly against the insurer and in favor of coverage." Furthermore, considerable Pennsylvania law, as interpreted by the federal as well as state courts, establishes that unless an insurer can prove that the insured was aware of the policy's exclusions and limitations, at least by means of receipt of the policy, the exclusions and limitations can be found ineffectual. *See, e.g., Daburlos v. Commercial Ins. Co.,* 521 F.2d 18, 24 (3d Cir.1975); *Williams v. Nationwide Ins. Co.,* 571 F.Supp. 414, 416–17 (M.D.Pa.1983); *Nationwide Mut. Ins. Co. v. United States Fid. & Guar. Co.,* 529 F.Supp. 194, 200–03 (E.D.Pa.1981); *Cornwell v. State Farm Fire & Cas. Co.,* 527 F.Supp. 310, 312–13 (E.D.Pa.1981); and *Mattes v. National Fidelity Life Ins. Co.,* 506 F.Supp. 955, 958–61 (M.D.Pa.1980), *aff'd,* 659 F.2d 1069 (3d Cir.1981), *cert. denied,* 454 U.S. 966, 102 S.Ct. 509, 70 L.Ed.2d 383 (1981).

The law of Alabama appears consistent with that of Pennsylvania regarding the principles that "any ambiguities in the policy are to be resolved in favor of the insured" and that exceptions to coverage must be interpreted as narrowly as possible in order to provide maximum coverage for the insured and "construed most strongly against the company drafting and issuing the policy." *Employers Insurance Co. of Alabama, Inc. v. Jeff Gin Co.,* 378 So.2d 693, 695 (Ala.1979). *See also, e.g., Burton v. State Farm Fire & Casualty Co.,* 533 F.2d 177, 178 (5th Cir.1976); *Cotton States Insurance Co. of Atlanta v. Diamond Housing Mobile Homes,* 430 F.Supp. 503, 506 (N.D.Ala.1977); and *Bituminous Casualty Corp. v. Harris,* 372 So.2d 342, 344 (Ala.App.1979). Indeed, these principles are "well established" throughout all American jurisdictions. 43 AM.JUR.2d 368 (1969). *See Kleckner v. Mutual Life Insurance Co. of New York,* 822 F.2d 1316, 1318 (3d Cir.1987) (applying New Jersey law).

Therefore, Burnhope must clear at least two significant hurdles to succeed in any aspect of his Motion: he must show that he is entitled to prevail even if (1) All doubts regarding pertinent facts and inferences therefrom are resolved against him; and (2) All ambiguities in the insurance contracts are likewise resolved against him. These are difficult hurdles to clear. It is necessary that we keep these principles foremost in our mind in considering the three difficult legal issues related to fidelity policies raised by the Defendant which we identified at page 442 *supra.*

E. ESTABLISHMENT OF POTENTIAL LOSSES TO THE DEBTOR–INSURED AS TO EACH OF THE CLAIMS IN ISSUE, EVEN THOUGH THE LOSSES WERE MORE DIRECTLY UPON INVESTORS AND CREDITORS OF THE DEBTOR THAN THE DEBTOR ITSELF, SUFFICES TO OVERCOME THE INSTANT MOTION AS TO THAT ISSUE IN ANY OF THE CLAIMS.

■ The first issue is whether the Trustee has made out any conceivable case that

the Debtor suffered actual losses as a result of actions by employees to accomplish "improper personal gain" for themselves, regarding which the policy applies. The basic position of Burnhope is that, even if the Debtor's covered employees engaged in fraudulent misappropriation of funds, if the funds were utilized to pay other corporate obligations, as opposed to being siphoned off directly into the employees' own pockets, there were no "losses" to the Debtor for "personal gain" of the employees as defined by the policies. The following rather impressive list of authorities are cited by Burnhope for this principle, although we note, in parenthesis, factors limiting the application of each of those cases here: *Everhart v. Drake Management, Inc.*, 627 F.2d 686 (5th Cir.1980) (Use of corporation's funds to satisfy other obligations of corporation instead of payments to Bank does not give *Bank* a cause of action against corporation's insurer); *Calcasieu-Marine Nat'l Bank v. American Employers' Insurance Co.*, 533 F.2d 290 (5th Cir.1976) (Loans made and drafts paid which were regular on their face, although made very unwisely by bank officer, not covered, especially in light of clause excluding losses from "loans"); *Bass v. American Insurance Co.*, 493 F.2d 590 (9th Cir. 1974) (Use of funds received from bond sales, by company which bought and sold bonds, for salaries and operating costs instead of bond repurchases, as would have been proper, held excluded by insurance clause exempting losses from "trading" bonds); *Fidelity & Deposit Co. v. Usaform Hail Pool, Inc.*, 463 F.2d 4 (5th Cir.1972); *appeal after remand*, 523 F.2d 744 (5th Cir.1975) (Claims based on contention that employees used funds in trust to pay other legitimate corporate obligations rejected); *Kerr v. Aetna Casualty & Surety Co.*, 350 F.2d 146 (4th Cir.1965) (Misrepresentation by loan company officers of financial status of borrowers, also owned by loan company officers, to obtain credit from loan companies not within the scope of fidelity bond); *Continental Casualty Co. v. First National Bank of Temple*, 116 F.2d 885 (5th Cir.1941) (Judgment for insured of fidelity bond reversed because of erroneous jury instructions which failed to provide that insured had burden of proof regarding losses); *First State Bank of Rocksprings v. Standard Accident Insurance Co. of Detroit*, 94 F.2d 726 (5th Cir.1938) (Insured bank failed to show loss from diversion of checks because the company on whose account checks were drawn made no claim and hence losses were not proven); *In re Schluter, Green & Co.*, 93 F.2d 810 (4th Cir.1938) (Insurer not held liable for improper use of securities by bookkeeper for other corporate transactions); *Towne Management v. Hartford Accident & Indemnity Co.*, 627 F.Supp. 170 (D.Md.1985) (Summary judgment granted where insured had shown only that certain funds were gone, but not where they went); *Calistoga National Bank v. Fidelity & Deposit Co. of Maryland*, 5 Cal.App.2d 248, 42 P.2d 1051 (1935) (Insured bank denied recovery from improper transfers from one of its bank accounts to another); and *National Surety Co. v. Fletcher Savings & Trust Co.*, 201 Ind. 631, 169 N.E. 524 (1930) (Wrongful diversion of funds from customer's account by bank manager not covered by bank's fidelity policy because bank did not suffer loss).

While this is an impressive array of authority, we would make certain observations about these cases as a group. First, none of them arose in the Third Circuit, and hence none of them are controlling on our disposition here. In fact, most of the cases are congregated primarily in the Fifth Circuit alone, and secondarily in the Fourth and Ninth Circuits. Such authorities from the South or the Far West are not without force, but they are certainly not binding upon us. Secondly, among these, only the *Bass* and *Towne* cases were decided on motions for summary judgment, and both are clearly distinguishable. Cases not involving motions for summary judgment, wherein the claimants were unable to make out case at trial, present a different situation from that here, where we are urged to make a holding, as a matter of law on a motion for summary judgment, that the insured cannot possibly make out a case. *Bass* involved a policy with a clause excluding "trading" losses, and the court found

that "trading" losses were in issue. The significance of a particular exclusionary clause quite different from that here was hence in issue there. In *Towne,* there was no proof of any loss whatsoever; the insured took the position that, since the funds were gone, it did not have to undertake any proof of where they went. Here, the Trustee is able to establish where most of the respective funds that were allegedly misappropriated actually did go. Thirdly, none of these cases involve fidelity clauses precisely like those in issue here. As we mentioned in discussing *Bass supra,* many were decided on the basis of the presence of particular exclusionary clauses in the policies in issue there. *See also, Calcasieu, supra.* Finally, later decisions in one of the principal authorities cited, the *Usaform* case, are more supportive of the position of the Trustee than that of Burnhope.

The later decision of the Fifth Circuit in *Usaform,* at 523 F.2d 744 (5th Cir.1975), a 20-page opus dwarfing the earlier three-page opinion cited at page 447 *supra,* establishes several principles which are pertinent here. First, it holds that, if funds were diverted from satisfaction of a particular designated purpose to another corporate purpose, such a diversion might well be covered by a fidelity bond, if the diversion was violative of corporate by-laws or applicable state law. 523 F.2d at 756–59. This is a most significant refinement of the holding set forth in such cases as *Kerr, Schluter,* and the previous *Usaform* decision, all of which might otherwise be read to preclude any recovery as long as funds diverted, however fraudulently and to ill-purposes, were used to satisfy obligations of the corporation.

Secondly, the court made it clear that, if it were proven that trust funds were unlawfully invaded, the burden of proving the legitimacy of the transaction was placed upon the insurer. *Id.* at 761. This holding balances the holding in *Towne,* and makes it clear, as does the *Towne* court itself, that the *Towne* holding is confined solely to a situation where the insured logically *should* be able to, but does not present any evidence to, explain where misappropriated funds have gone. Here, of course, unlike

*Towne,* the Plaintiff is a Trustee whose access to evidence as to where misappropriated funds have gone is little better than that of the insurer. After the last remand in *Usaform,* we note that the district court proceeded to hold that the insurer failed to meet its burden of showing that the funds in issue were legally diverted in the case of all five claims specifically in issue, and hence that the insured prevailed on these claims. *Fidelity & Deposit Co. of Maryland, v. Usaform Hail Pool, Inc.,* 465 F.Supp. 478, 485–88 (M.D.Fla.1979).

The ultimate result in *Usaform* is consistent with that reached in the admittedly smaller number of cases where insured parties have succeeded in collecting on fidelity insurance policies. *See Citizens State Bank v. Transamerica Insurance Co.,* 452 F.2d 199 (7th Cir.1971) (Recovery allowed even though employee's misconduct appeared in the nature of negligent performance of duties and efforts to cover up prior negligence rather than outright conversion of funds); *Arlington Trust Co. v. Hawkeye Security Insurance Co.,* 301 F.Supp. 854 (E.D.Va.1969) (Bank employee's failure to accurately report performance of his department to conceal its poor accomplishments held to permit recovery); and *Pacific-Southern Mortgage Trust Co. v. Insurance Co. of N. America,* 166 Cal. App.3d 703, 212 Cal.Rptr. 754 (1985) (Loss occurs at time dishonest act of insured employee occurs, not when insured must make good for act).

■ As the last *Usaform* Court of Appeals decision points out, making the burden of proof upon the insured party in a fidelity bond too difficult would render it hard to imagine a situation where there ever could be an insurable loss on such a bond. 523 F.2d at 727. While conditions of an insurance contract should, like any contract, be given effect, exclusions must be read in the context of the purpose of the policy, and not in such a way as to allow all or most of the coverage to be eliminated through the medium of exclusions.

Burnhope also argues that the exclusionary clause in the bonds relating to "salary,

fees, commissions and other emoluments, including salary increases and promotions" excludes liability for fraudulent conduct of the Debtor's employees directed at eliminating their own personal liabilities. Cases which Burnhope cites in support of this argument are *Hartford Accident & Indemnity Insurance Co. v. Washington National Insurance Co.*, 638 F.Supp. 78 (N.D.Ill.1986); *Morgan, Olmstead, Kennedy, & Gardner, Inc. v. Federal Insurance Co.*, 637 F.Supp. 973 (S.D.N.Y.1986); and *Benchmark Crafters, Inc. v. Northwestern National Insurance Co.*, 363 N.W.2d 89 (Minn.App.1985).

We do not agree that these cases support the result urged by Burnhope. These cases concerned employees who fraudulently inflated their sales to obtain higher commissions. Here, the fraudulent actions were perpetrated by the Debtor's employees to eliminate personal liabilities, actions which had no connection with the employees' compensation, as did the actions in the above cases. The exclusionary clause quoted in the last paragraph therefore would not appear to affect the claims in issue here.

F. BURNHOPE HAS ESTABLISHED THAT COVERAGE IS EXCLUDED FOR ACTS BY RICHARD MICHEEL SUBSEQUENT TO DECEMBER 22, 1980.

 The second important issue is whether fraudulent acts of Richard Micheel are covered by the policies. In this regard, we note that the second bond, effective December 22, 1982, includes a rider stating that "except with respect to Insuring Clauses 1, 5 and 9, Richard I. Micheel is deemed to be an 'employee' as defined in the attached bond." Insuring Clause 1 referred to in the rider is the fidelity clause quoted at pages 442–443 *supra*. As we read the Trustee's Brief, the Trustee does not argue that Mr. Micheel is covered by the second Bond, thus eliminating any liability for acts solely at the hands of Micheel after December 22, 1982. The Trustee contends, however, that, since Micheel was not excluded from the first bond, he must be considered included in it.

However, Burnhope counters by attaching to its Reply Brief a rider, effective December 22, 1980, which was also included with the first bond, exempting Micheel from coverage in language identical to that in the rider to the second bond. The Trustee has no response to Burnhope's argument that the rider to the second bond is effective, and we therefore conclude that this rider is valid and effective as well.

Burnhope argues that Micheel should not be covered for any period, irrespective of the rider, which is a question that we must reach to determine the insurer's liability for Micheel's actions between December 22, 1979, and December 22, 1980, when the first rider became effective. However, we choose to follow those cases which hold that a majority stockholder and corporate principal such as Micheel is not such an "alter ego" of the corporation that he could not be considered as an "employee," irrespective of the presence of the rider. *Usaform, supra*, 523 F.2d at 754–55; and *General Finance Corp. v. Fidelity & Casualty Co. of New York*, 439 F.2d 981, 984–86 (8th Cir.1971). *Contra, Employer's Administrative Services, Inc. v. Hartford Accident & Indemnity Co.*, 147 Ariz. 202, 709 P.2d 559, 561–64 (1985). In addition to finding the reasoning of *Usaform* and *General Finance* more convincing, we also observe that, if the insurers wished to include a specific provision that Micheel was not to be an "employee" for purposes of the fidelity clause, they knew how to do so, i.e., by attaching a rider. If the insurers really believed that Micheel was excluded without attaching the rider, then there would have been no reason to ever create the rider excluding him. Also, the rider, by implication, provides that Micheel is not excluded from coverage for other aspects of the policy other than Clauses 1, 5, and 9. Hence, construing an ambiguity against the insurers, he must be considered as an "employee" except where specifically excluded.

However, from the coverage of the Fidelity clause subsequent to December 22, 1980, by reason of his specific exclusion, Burnhope is only rendered liable as to ac-

tions performed by Micheel prior to December 22, 1980, i.e., between December 22, 1979, and December 22, 1980.

The Trustee, in Count II of the Amended Complaint, alleges that the Defendants are estopped from denying coverage of Micheel's acts. However, the Trustee has pointed to no facts in the record, and has presented nothing by affidavit or otherwise, tending to support this claim. While we are not inclined to interpret the caselaw concerning when it is appropriate to grant summary judgment liberally in favor of moving parties, *see* pages 444–445 *supra,* we believe that the Trustee's failure to respond to Burnhope's Motion on this issue with *any* factual assertions is fatal to this claim, at least as to Burnhope. Therefore, we cannot recognize such a claim as to Burnhope, although this of course does not rule out such an estoppel claim as to Bankers. Thus, as to Burnhope, we hold that all actions perpetrated by Micheel subsequent to December 22, 1980, are excluded.

## G. THE TRUSTEE HAS STANDING TO RAISE ALL OF THE CLAIMS ASSERTED.

▓ Burnhope's final, related arguments are that (1) Many of the losses caused by the fraudulent acts of the Debtor's employees affected only creditors and/or investors of the Debtor; (2) Such creditors and/or investors do not have standing to sue under the bonds as third-party beneficiaries, citing such cases as *Everhart, supra; American Empire Insurance Co. v. Fidelity & Deposit Co. of Maryland,* 408 F.2d 72 (5th Cir.), *cert. denied,* 396 U.S. 818, 90 S.Ct. 55, 24 L.Ed.2d 69 (1969); and *Employer's Administrative Services, supra;* and (3) The Trustee has no standing, in any event, to pursue claims on behalf of creditors and/or investors, citing *Caplin v. Marine Midland Grace Trust Co.,* 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 190 (1972); *Rochelle v. Marine Midland Grace Trust Co.,* 535

F.2d 523, 527 (2d Cir.1976); *In re Washington Group, Inc.,* 476 F.Supp. 246 (M.D.N.C.1979); and *Baehr v. Touche Ross & Co., supra,* 62 B.R. at 798.[4]

We believe that the weakest point of this logical progression is the first premise. Although certain misappropriations of funds were direct losses to creditors of the Debtor and other losses were direct losses to investors in the Debtor, such losses also appear to constitute at least indirect losses to the Debtor, since the Debtor may well be subject to any liability for claims from creditors and investors who suffered losses. Therefore, we do not agree that losses to the creditors and/or the investors might not also be losses to the Debtor, at least as a matter of law.

Another weak point of Burnhope's argument is the third premise. The Trustee asserted, in his Brief, that he had specific written authorizations from investors to maintain this suit on their behalf. Furthermore, despite the Trustee's apparent concession on the point, we are not certain that the Trustee, in his broad role as "representative of the estate," 11 U.S.C. § 323(a), could not pursue actions which would benefit creditors and/or investors but would also, at least indirectly, benefit the estate as well. "Benefitting" parties who would otherwise have claims against the estate hardly seems out of the permissible realm of a Trustee's duties. The *Caplin* and *Rochelle* cases addressed and restricted the rights of a Trustee appointed in the limited role envisioned by Chapter X of the Bankruptcy Act. Also, the matters considered in these cases were substantively within the scope of the federal Trust Indenture Act, 15 U.S.C. § 77ccc(18), and the language of this Act was heavily relied upon by the courts in reaching their decisions. The *Washington Group* court expressly relied upon the language of Chapter X of the Bankruptcy Act in reaching its decision. 476 F.Supp. at 251. The *Baehr* case addressed only the issue of the Trustee's

---

4. This last case is a matter arising out of a claim made by the Trustee in the related Philadelphia Mortgage Trust case against that Debtor's accountants, charging that they negligently failed to uncover frauds of that Debtor's employees similar to the frauds in issue here. This matter was tried before a jury in the District Court, and resulted in a verdict in excess of $200,000.00 for the Trustee. Post-trial Motions are pending in the District Court.

rights pursuant to 11 U.S.C. § 544. As in other contexts where we have been confronted by arguments that litigants lack standing, we are reluctant to sustain such contentions as means of avoiding the necessity to decide issues on their merits. *Cf. In re United Church of Ministers of God*, 74 B.R. 271, 276 (Bankr.E.D.Pa., 1987); *In re Young*, 70 B.R. 968, 970–71 (Bankr.E.D.Pa. 1987); and *In re Morrison*, 69 B.R. 586, 589–90 (Bankr.E.D.Pa.1987).

## H. REVIEW OF EACH OF THE ELEVEN CLAIMS IN ISSUE IN LIGHT OF THE FOREGOING PRINCIPLES

Having thus discussed the general legal issues raised by the parties hereto, we are now prepared to apply the principles which we developed in this discussion to the eleven specific claims of misappropriation under the bonds in issue.

### 1. MISAPPROPRIATIONS OF INVESTORS' FUNDS AMOUNT IN ISSUE: $4,372,000.00.

The Debtor maintained escrow accounts for the purpose of servicing the mortgages of its investors. The funds were earmarked for payment of principal, interest, taxes, and insurance on the mortgages. Between 1980 and 1983, employees and officers of the Debtor withdrew the total amount in issue from these accounts, using the funds not for their designated purpose but to pay off loans and obligations that were personally guaranteed by employees and officers of the Debtor. To help replenish the depleted escrow accounts, additional monies were taken from other accounts, loan sources, draft "warehousing," or "warehousing" accounts,[5] and sales of certain assets and were redeposited into the invaded escrow accounts. By the time that the Debtor filed its Chapter 11 petition on September 7, 1983, there remained a net loss, after replenishment, of $1,775,000.00.

We do not believe that summary judgment should be granted on this claim be-

cause there are three questions which involve issues of material fact which must be resolved: (1) For what purposes did the Debtor use the misappropriated funds and did losses result therefrom? (2) Were the employees and officers that invaded the escrow accounts the same ones who had personally guaranteed the loans and obligations that were paid off? (3) Should the claim be for the net loss of $1,775,000.00 or the total amount in issue, $4,372.000.00?

Burnhope argues that the invasions into the escrow accounts by the Debtor's employees and officers were for the purpose of paying off corporate obligations and therefore cannot be considered a loss, nor considered to have been made with the intention to make improper personal financial gain. However, the Debtor argues, with some force, that even if the purpose of the fraud was to pay off corporate obligations, such payments were in violation of state law and therefore the funds were not properly used for payment of corporate debts. Further, Burnhope fails to note that, even if the Debtors did withdraw the funds from the investors' escrow accounts to pay corporate obligations, there is still a shortage of $1,775,000.00 in the accounts.

Thus, although the Trustee agrees that corporate obligations were paid with the misappropriated funds, he argues that the officers and employees did, in fact, benefit from their fraud. As Mr. Miller's uncontested Affidavit avers, the Debtor was insolvent almost from its inception, and hence funds were taken from an insolvent entity, which might be pertinent in an analysis as to whether these actions were illegal under state corporate law. The proceeds from the invaded accounts were used to retire approximately $8 to $9 million in debt that was personally guaranteed by certain employees of the Debtor. As soon as the last debts which were personally guaranteed were paid off, certain of the employees resigned from the company. Their personal benefit was obviously served by using the money from the

---

**5.** The term "warehousing" frequently appears in the parties' Briefs and the record, without any attempt at a definition. We have an admittedly vague conception that this term indicates that the matters in issue are stored at certain institutions. However, we will have to await trial to obtain a clearer concept of this term.

escrow accounts, as well as new loans, to retire their personally guaranteed debts.

The next question is whether the employees and officers that invaded the escrow accounts were the same employees and officers who had the personally guaranteed loans and obligations which were paid off from the funds in issue. Burnhope claims that the Trustee failed to produce the guarantees. However, the Trustee did attach copies of the guarantees to his Brief and asserts that some were produced at the deposition of Mr. Miller and that all of the employees who actually perpetrated the fraudulent or dishonest acts were acting under the direction of or in collusion with the officers and employees who had personal liability on the loans. We cannot resolve this factual issue against the Trustee on the present record.

Burnhope also argues that the Trustee did not have any documentation demonstrating that officers or employees of the Debtor were released from personal liability as the result of escrow account invasions. The Trustee, on the other hand, accurately claims that he had documentation of records of various lending institutions containing releases marked for identification at the depositions. This, the Trustee claims, indicates that those officers and employees who personally guaranteed loans had their debts retired. These records are zero balances as of a certain date and are supported by checks, wire transfers, or other documents showing how payments were made.

The last question is whether the claim could conceivably before $4,372,000.00, the gross loss, as opposed to the net loss of $1,775,000.00. The $1,775,000.00 is the sum which both parties agree was the shortage in the escrow accounts, after they partially replenished, at the time the Debtor filed bankruptcy. However, it must also be recalled that the Debtors' employees had no rights to use those funds for other than the payment of taxes, insurance, and other payments involved in the servicing of the mortgages. The Debtor could easily be held liable under state law for the inappropriate withdrawal of all of the funds withdrawn.

According to Mr. Miller, although the investors lost $1,775,000.00, if all of the fraudulent transactions were unraveled, then there would be a total loss to the investors of $4,372,000.00. Thus, it appears that if all the funds obtained through fraudulent means were used to replenish the invaded accounts, then there would be total loss of $4,372,000.00. However, the money used to replenish the escrow accounts should be accounted for in the other claims, and of course cannot be recovered twice.

Based on the foregoing analysis, we hold that Burnhope's Motion for Summary judgment must be denied. If the investors are obliged to return all of the funds that were obtained through the fraud of the Debtor's employees, the full $4,372,000.00 would be a loss to the Debtor. However, this figure should be reduced by any sums recovered by the Trustee in other claims which were used to replenish these accounts.

## 2. HIGHLAND LAKES NATIONAL BANK LOSS AMOUNT IN ISSUE: $300,000.00

On August 26, 1983, Highland Lakes National Bank (hereinafter referred to as "Highland"), made a 60–day $300,000.00 loan to the Debtor. The Debtor collateralized the loan by an assignment of eight mortgages to Highland. However, six of these mortgages had previously been assigned by the Debtor to the General National Mortgage Association (hereinafter referred to as "GNMA") as part of a pool of mortgages, and the Debtor had also pledged them as security to two other banks. Further, the Debtor had previously assigned the other two mortgages to Colonial Bank as collateral for a "warehousing line." [6] The Debtor has not repaid the loan to Highland but the Trustee asserts that the Debtor suffered a loss because Highland has filed a claim against the Debtor for the amount of the loan in the bankruptcy proceeding.

---

**6.** See page 451 n. 5 *supra*.

It should further be noted that the Debtor used $224,584.28 of the Highland loan to reduce its warehouse line at First National Bank of Louisville (hereinafter "Louisville"), which was personally guaranteed by certain employees of the Debtor, and the remainder of the loan was used to pay salaries to the officers of the Debtor.

We hold that Burnhope's Motion for Summary Judgment must be denied as to this claim, although we note that the liability should not be measured by the amount of the loan. The Debtor apparently clearly owes the $300,000.00 sum to Highland, and would owe this sum whether there had been fraud in the collateralization of the loan or not. The only losses potentially recoverable are the losses which are proven to have been the consequences of the frauds. As far as we can see, this would be the extent to which the Debtors' liability to Highland is due to the frauds in collateralization as opposed to any other reasons.

We can readily see that there are contingencies in this claim. We do not know how much of the claim will be paid to Highland. We do not know whether proper collateralization would have cushioned or eliminated this loss. We also do not know what employees were responsible for the fraud, and what personal benefits they obtained thereby. To succeed on this claim, the Trustee would have to prove that employees gained personally and the Debtor suffered a certain determinable loss from the fraud.

However, it does appear that fraud occurred, and therefore we think it likely that some employees did gain and the Debtor did suffer some adverse consequences due to the miscollateralization. This likelihood is, we think, sufficient to require us to deny Burnhope's Motion, with the caveat that the liability is unlikely to actually be $300,000.00.

3. PENNSYLVANIA HOUSING FINANCE AGENCY (hereinafter referred to as "PHFA") LOSS AMOUNT IN ISSUE: $68,909.08

On April 17, May 5, and June 7, 1983, a separate but related corporation, Leedy of Pennsylvania (hereinafter referred to as "PA Leedy"), sold three mortgages to PHFA. The sale price for the mortgages was $68,909.08. The Plaintiff and Defendant disagree as to whether the Debtor in fact owned the mortgages at the time of the sale, the Trustee claiming that the Debtor did own them and Burnhope claiming that the Debtor had only owned them in the past. Prior to this sale by PA Leedy to PHFA, the Debtor had pledged these same mortgages as collateral to Louisville, thus giving rise to the element of fraud. The Trustee claims a loss because the Debtor never received the proceeds from the sale of the mortgages. It should be noted, however, that the Trustee is litigating a separate adversary proceeding against PHFA claiming that PHFA never paid for the mortgages.

It is not known where the proceeds from the first mortgage went. However, proceeds from the sales of the second and third mortgages were deposited into Central Penn National Bank and First Pennsylvania Bank, respectively. The First Pennsylvania account belonged to PA Leedy. It is unknown to whom the Central Penn Account belonged.

Burnhope's motion for summary judgment is based upon its contention that PA Leedy rather than the Debtor owned the mortgages, and hence that PA Leedy was entitled to the sale proceeds. Also, Burnhope argues that the Trustee has failed to identify any act of dishonesty or fraud committed by any employee of the Debtor, or how any employee could have benefited from such dishonesty or fraud.

The Trustee, on the other hand, claims that the Debtor suffered a loss because it did, in fact, own the mortgages and received nothing in return for their sale, the proceeds going instead to PA Leedy. In addition, the Trustee contends that the dishonesty or fraud committed by employees of the Debtor consisted of directing PHFA to pay proceeds from the sale of the mortgages to PA Leedy and not to the Debtor, and that the proceeds were used to pay off loans of PA Leedy which officers and employees of the Debtor had personally guaranteed.

The dispute over the ownership of the mortgages and whether acts of dishonesty or fraud were committed raise factual issues, causing us to deny Burnhope's motion for summary judgment on this claim. However, if the Debtor recovers the $68,909.08 in its adversary proceeding against PHFA, then there would be no loss. In our view, the loss would be measured only by ascertaining the amount by which the frauds of the Debtor's employees created a defense to PHFA as against any recovery in the aforesaid adversary proceeding.

#### 4. PHILADELPHIA MORTGAGE TRUST LOSS (hereinafter referred to as "PMT") AMOUNT IN ISSUE: $810,000.00

In 1979, the Debtor received $510,000.00 from PMT and later received $300,000.00 from PMT in 1982. On April 1, 1980, the Debtor issued a "certificate of participation" [7] in mortgages to PMT. There is a dispute in the record between the Debtor and PMT over the nature of the loans. According to the Debtor's books, they were unsecured loans. In addition, the Debtor also listed the loans as retired debts in 1982. PMT, on the other hand, claims that the loans were not unsecured but were secured by a GNMA Certificate from 1980 to 1982.

The Trustee asserts that the Debtor suffered a loss as a result of these transactions because PMT may assert a claim against Leedy. In addition, the Trustee claims that loan money was diverted to other than its intended use, i.e., participation in a GNMA Certificate, and thereby was lost as an asset.

Apparently, $310,000.00 of the $810,000.00 was used to replenish GNMA and Federal National Mortgage Association (hereinafter referred to as "FNMA") escrow shortages. According to Mr. Miller's testimony, PMT has a claim against GNMA and FNMA because they directly benefited from these funds. The remainder of the Claim, $500,000.00 was used to retire debts

personally guaranteed by the Debtors' employees.

Burnhope, in his Reply Brief addressing this claim, quotes at length from the depositions to establish that Mr. Miller contended that the funds were used to retire debts of the Debtor and replenish shortages in the Debtor's escrow accounts. While this appears to be true, Mr. Miller, and we also, point out that such a showing does not negate the potential establishment of a loss. Therefore, we are not inclined to grant Burnhope's Motion.

We do, however, note that the Trustee must overcome several hurdles if he is to prevail on the claim. First, he must establish that there was fraud. We note that the Trustee is, even more than usual, vague on describing this element here. Secondly, he must show that PMT is pursuing a claim for a sum certain against the Debtor. Further, he must establish the amount of that claim that is attributable to the fraud of the Debtor's employees, which is unlikely to be the entire sum of the claim. Given all of these contingencies, it is unlikely that the claim will actually approach the full $810,000.00 initially stated to be the amount of this claim. However, we believe that a sufficient possibility that the Trustee will prove all of the necessary elements exists as to some amount such that we shall deny Burnhope's Motion as to this claim.

#### 5. EMPLOYEE THEFT LOSS. AMOUNT IN ISSUE: $5,377.27

No motion for summary judgment was filed as to this claim.

#### 6. CHASE MANHATTAN BANK (hereinafter referred to as "Chase") LOSS AMOUNT IN ISSUE: $200,000.00

In February, 1981, the Debtor arranged to receive data processing services from Computer Power, Inc. (hereinafter referred to as "CPI"), a subsidiary of Chase. CPI offered credit against data processing charges for value earned by Chase on non-

---

**7.** This is another term which, like "warehousing," we wish to advise that we do not totally comprehend. Hopefully, this will be explained to us at some later point in the proceedings.

interest bearing accounts maintained as Chase by or on behalf of CPI customers.

On or about April 1, 1981, First Alabama Bank (hereinafter referred to as "FAB") agreed to put funds in non-interest bearing deposits at Chase on behalf of the Debtor, in order that the Debtor could become a CPI customer under the aforesaid arrangement. CPI was to receive the 90–day Treasury Bill rate less a fifteen (15%) percent reserve requirements, and credit the Debtor's CPI bill for the same amount.

In December, 1981, Chase transferred $200,000.00 into the Debtor's disbursement clearing account at FAB. The Debtor routinely used monies in that account to pay insurance, taxes, principal, and interest. Mr. Miller stated that he had evidence that the account was used for other purposes as well and that, in the future, he would be able to give a breakdown of the use of funds in the amount.

Chase maintained that it made the transfer upon instructions from Mr. Micheel. To offset the transfer, Chase cancelled a non-interest bearing certificate of deposit for $200,000.00 held by Chase in FAB's name for the Debtor and restored the funds to FAB's correspondent account. Chase maintained that Mr. Micheel further instructed Chase to debit the FAB correspondent account in the amount of $200,-000.00 and transfer said funds to FAB to be placed in the Debtor's mortgage disbursement clearing account.

At his deposition, Mr. Miller characterized the transaction as a "mistake" without further explanation.

The error was discovered by FAB after May 19, 1983. In order to obtain a release from FAB, the Debtor reversed the transfer. On August 4, 1983, the Debtor's employees authorized transfer of $200,000.00 from the Debtor's disbursement clearing account to FAB. After the Debtor filed bankruptcy about a month later, an action to avoid the August 4, 1983, transaction as a preferential transfer was filed by the Trustee against FAB. FAB has joined Chase as a third-party Defendant in that action. We recently were advised that this proceeding has been settled, although the terms of settlement have not yet been disclosed to us.

The characterization of the facts in this case is disputed. The Trustee maintained a loss of $200,000.00 was sustained because the Debtor's employees fraudulently instructed Chase to transfer the monies to the Debtor's account. Chase's answer in the preference action suggests such a result. However, Mr. Miller twice referred to the transaction as a "mistake," as did the Trustee's counsel. No specific evidence was presented beyond characterization of the transaction as a "mistake." Using the depositions as the basis for decision, a "mistake," rather than "fraud" or "dishonesty," seem to explain the transfer. Chase's explanation suggests fraud or dishonesty, but we question whether or not Chase would have been likely to make such a transfer given the CPI procedure for payment of bills.

The parties disagree as to whether or not a loss was sustained by the Debtor. Simply put, the transfer involved FAB funds at Chase transferred to the Debtor—we believe by mistake—and transferred back to FAB. The Debtor maintains that a loss would have been sustained if it had failed in the preference proceeding. Payment of the claim would have been made from monies to which the Debtor had no rightful claim in the first place. While it is possible that the funds were used to cover up other improper uses of funds, this is pure speculation. We also note that, if there was a fraud, it was a post–1980 act of Mr. Micheel which caused it. In light of the foregoing, we hold that the Trustee was not presented sufficient evidence to withstand Burnhope's motion for summary judgment on this claim, and hence the motion will be granted as to this claim.

7. NORTHWESTERN NATIONAL INSURANCE COMPANY (hereinafter referred to as "NW Nat'l") LOSS AMOUNT IN ISSUE: $705,000.00

This matter is based upon a claim by NW Nat'l seeking indemnification from the Debtor for a $705,000.00 payment it made to Bank Leumi based on NW Nat'l's sure-

tyship to Bank Leumi for a lost Certificate in circumstances described hereafter.

In October, 1981, the Defendant claimed that it lost a GNMA Certificate with a face value of $1,009,129.04. In order to obtain a replacement Certificate from GNMA, the Debtor applied to NW Nat'l on October 29, 1981, for a bond of suretyship in the amount of $1,009,129.04 in favor of GNMA and the Debtor. Mr. Micheel signed the application and personally indemnified the bond. On October 30, 1981, NW Nat'l issued a "bond for securities lost or destroyed" binding the Debtor as principal and NW Nat'l as surety to GNMA for $1,009,129.04 for any loss resulting from the original Certificate.

The parties disagree over all other pertinent facts. According to Burnhope, on July 26, 1983, Investment Corporation of America (hereinafter referred to as "ICA") entered into a hypothecation agreement with Bank Leumi for $680,000.00, collateralized by the original Certificate which was allegedly lost. Mr. Micheel, who was President of ICA, signed the agreement, and Mr. Micheel and another employee of the Debtor signed a Certificate of Authority representing that the shareholders and directors of the Debtor approved the Certificate Pledge to Bank Leumi.

The Trustee contends that the Debtor assigned its interest in the GNMA Certificate to ICA for no consideration. The GNMA Certificate was then allegedly pledged by ICA as collateral for a loan in the amount of $900,000.00 from Fidelity Bank to ICA. The proceeds of this loan was not paid to the Debtor, but to ICA, although the Debtor's assets were pledged as collateral. In July, 1981, in order to put off the Fidelity Bank Loan, ICA entered into a transaction to borrow funds from Bank Leumi secured by a pledge of the same GNMA Certificate. The Debtor did not receive any proceeds from this transaction. In addition, it may be noted that the same GNMA Certificate was pledged to PMT on September 30, 1980. See Claim 4 *supra.*

According to Burnhope, the Debtor defaulted on its obligations to Bank Leumi,

and the Bank decided to exercise its rights on the pledged Certificate. Bank Leumi discovered that the Certificate was a duplicate and made a claim against GNMA, and GNMA in turn made a claim against NW Nat'l under the Surety Bond. NW Nat'l paid $705,000.00 to Bank Leumi and received in exchange an assignment of Bank Leumi's rights against the Debtor, ICA, and their officers and directors. NW Nat'l has filed a Proof of Claim for $705,000.00 against the Debtor in the bankruptcy proceedings. According to Burnhope, the proceeds from the Bank Leumi loan were used to retire a loan from Fidelity Bank.

The Trustee contends that the Debtor suffered a loss as a result of employee fraud and dishonesty. The loss was caused by the pledging of a previously-pledged GNMA Certificate, which is the reason for the $705,000.00 claim against Leedy. However, the only employee whose dishonesty is in issue is Mr. Micheel, and this transaction post-dated his exclusion from coverage as of December 22, 1980. Although there are considerable factual issues involved, the fact that it is Mr. Micheel's fraud which is alone in issue causes us to conclude that we must grant Burnhope's motion for summary judgment as to this claim.

### 8. MORTGAGES SOLD TO FNMA AMOUNT IN ISSUE: $812,436.78

From May to September, 1983, the Debtor sold mortgages "warehoused"[8] at Germantown Saving Bank (hereinafter referred to as "Germantown") and Louisville to FNMA. Germantown received all of the proceeds except as to one mortgage and Louisville received no proceeds. The Debtor allegedly used the proceeds to retire a corporate debt and to replenish shortages in FNMA escrow accounts. Either the Debtor or PA Leedy eventually paid Louisville, but, thereafter, the Trustee brought a preference action against Louisville. The depositions do not identify which employees of the Debtor were responsible for the diversion of funds. Employees of the Debtor obtained improper personal financial gain, since the satisfied corporate obli-

---

**8.** See page 451 n. 5 *supra.*

gations which were satisfied had been personally guaranteed by the Debtor's employees.

The Trustee's main argument is that PA Leedy rather than the Debtor received the mortgage proceeds. Mr. Miller testified that the proceeds definitely ultimately came into the hands of PA Leedy, not the Debtor, but allowed that PA Leedy may have retired debts of the Debtor with the proceeds.

The Trustee also argued that, prior to the sale of the mortgages to FNMA, the same mortgages had been pledged as collateral for "warehouse" loans from either Germantown or Louisville. The fraudulent activity consisted of the "warehousing" of loans without properly delivering the original document and reselling the same mortgages to FNMA and then diverting the proceeds to outside corporations.

Burnhope accurately points out that the exhibits do not show where the Debtor got the money to make the payments. Nevertheless, the testimony of Mr. Miller at the depositions, while candid in stating a lack of certainty, does present a hypothesis which could support the Trustee's claim.

While we admit that this matter presents a close call, we will deny the motion for summary judgment as to this claim. The principal facts which the Debtor will have to prove is where the funds went, that they were diverted, and that the Debtor suffered a loss as a result of the diversion(s). Also, the facts of what fraud or dishonesty occurred, and whether or not the employees involved in the fraud can be identified, are uncommonly muddled, even relative to other claims stated herein. However, we believe that reasonable minds could disagree as to the inferences to be drawn from the evidence presented, although the Trustee would clearly have to convince us to resolve all of these questions in his favor if he is to eventually prevail on the merits.

9. NATIONAL WESTMINSTER (hereinafter referred to as "Nat'l West") LOSS AMOUNT IN ISSUE: $601,591.00

According to the Trustee, on May 1, 1982, the Debtor fraudulently obtained a "warehouse" line of credit with Nat'l West by pledging mortgage notes, some of which were part of a GNMA mortgage pool that had been pledged to other institutions, and the remainder of which had already been pledged to Colonial Bank for a "warehouse" line of credit. The Trustee returned the mortgage notes to Nat'l West that allegedly belonged to Colonial Bank, and the Trustee now claims that the Debtor suffered a loss due to the remaining indebtedness to Nat'l West of $601,591.00, which is the face amount of the mortgages in the pool.

However, the Trustee was involved in an adversary proceeding with Nat'l West, in which the latter agreed to a reduction of its claim from $601,591.00 to $60,000.00. The Trustee still asserts that this amount of indebtedness is a loss which is covered under the bonds because it resulted from the fraudulent and dishonest pledging of assets of the Debtor to Nat'l West which had been pledged at other institutions. As a result of these prior claims to the mortgages, Nat'l West suffered these losses. The proceeds from the warehousing of the loans by Nat'l West were used by the officers and employees of the Defendant to pay obligations for which these employees were liable.

There are certain issues of material fact in issue in this claim. The first issue is identifying the corporate assets that were allegedly paid off from the proceeds of the Nat'l West warehouse loans. The Trustee argues that he has provided evidence that indicates such use of the loans. Burnhope, on the other hand, argues that such evidence has not been provided by the Trustee.

Another issue is identification of employees who committed the fraudulent acts. Burnhope argues that the Trustee failed to identify the employees who paid off their personally guaranteed debts, and that the Trustee did not identify any employees who either committed the fraud or paid off the personally guaranteed obligations in regard to this Claim. However, in the depo-

sition, some employees and officers had been identified, although one was Mr. Micheel.

Certain issues of fact exist which, if resolved against the Trustee, would eliminate this claim entirely. However, as to the motion in issue, we believe that the significant fact is that the settlement of the preference action for $60,000.00 reduced the Debtor's potential loss to that sum. Therefore, while the Motion will be denied, liability thereupon will be limited by us to no more than $60,000.00.[9]

### 10. COLONIAL BANK LOSS AMOUNT IN ISSUE: $1,384.063.00

Three loans were obtained by the Debtor from Colonial Bank. The first loan, obtained March 25, 1980, was secured by the collateral attached to a participation loan in the Delmar Nursing Home. On April 30, 1983, Leedy owed $310,000.00 on that loan. The collateral was nonexistent since the Delmar Nursing Home loan was paid off in 1979. Mr. Miller stated he knew the name of the employee of the Debtor who pledged that loan with Colonial Bank.

The second loan consisted of a "warehousing" line using mortgage loans as collateral. The mortgage loans securing this debt were previously pledged to other Banks.

The third loan consisted of an "add-on" loan to the second ("warehousing" line) loan mentioned above. This loan was a temporary line and exceeded Colonial Bank's lending power to the Debtor, per Federal Regulations. Mortgages were also double-pledged in this transaction.

The proceeds of these loans were used to pay off loans at other banks, primarily, per Mr. Miller, loans to FAB and American Heritage. Employees of the Debtor were personally liable for the retired FAB loans; and their names are known by the accountants. Colonial Bank's documents for these loans showed evidence of tampering, e.g., "white out" marks.

The presence of double-pledging, pledging non-existent loans, and irregularities in Colonial Bank's documents supported the Trustee's contention that fraudulent or dishonest conduct by employees of the Debtor occurred. The retirement of loans personally secured by employees of the Debtor support the Trustee's contention that improper personal financial gain was involved in securing the Colonial Bank loans.

How the loan proceeds were used is at this point unclear. Mr. Miller was unable to state with certainty the sequence of events. One of Mr. Miller's employees used "his best estimate to reconstruct where the proceeds went." Although, again, the Trustee would have to present considerably more evidence to prevail at trial on this claim than he has to date, we hold that sufficient evidence was presented to preclude granting Burnhope's motion for summary judgment on this Claim at this juncture.

### 11. FIRST NATIONAL BANK OF LOUISVILLE (hereinafter referred to as "Louisville") LOSS AMOUNT IN ISSUE: $2,243,687.00

On March 24, 1983, the Debtor entered into a "warehouse" loan agreement with Louisville for approximately $2,500,000.00. The Debtor used the proceeds of the loan to purchase new mortgages. The Trustee asserts that, after the Debtor sold the mortgages financed by Louisville, the sale proceeds were not used to repay the Louisville loan. According to the Trustee, the Debtor did not repay Louisville until a day within the ninety days of the filing of the Bankruptcy petitition. Further, according to the Trustee, the Debtor paid the loan to Louisville to cover up fraudulent and dishonest acts that Louisville allegedly discovered and which prompted it to bring a suit against the Debtor in August, 1983. This suit was discontinued after the payment was made.

---

**9.** We believe that this claim is, in several respects, similar to Claim 2 (Highland). The distinction is that, here, the claim of Nat'l West has been liquidated as $60,000.00, while the amount of the Highland claim remains totally uncertain. This Claim raises some of the same problems and issues as that claim.

Presently, the Debtor has suffered no losses from indebtedness to Louisville. The proceeds were used to purchase new mortgages. However, the Trustee has filed an action against Louisville to recover $1.7 million, which he later contended was the amount of the preferential transfer, and the Trustee asserts that, if he wins the preference action against Louisville, Louisville can assert a claim against the Debtor which will arise out of the fraudulent and dishonest acts of the officers and employees of the Debtor.

An impediment of the Trustee to recovery on this claim is the fact that, as of now, the Debtor has not suffered a loss from the Louisville transaction, and, if he cannot prove some loss by the date of trial, he cannot prevail. According to the Trustee, a loss would occur only if the Trustee wins the preference action sought to recover $1.7 million from Louisville, and, thereafter, Louisville asserts a Proof of Claim against the Debtor. Obviously, this Proof of Claim could not exceed $1.7 million, and hence that sum is a cap on this claim. We also note that the Trustee has not named an employee of the Debtor engaged in fraudulent conduct in this transaction, which also indicates another contingency which the Trustee would have to resolve to prevail.

However, as in our discussions of Claims 8 and 10 *supra,* we cannot grant Burnhope's motion for summary judgment in connection with this Claim, because the Trustee could possibly prevail on it, at least to the extent of $1.7 million. Hence, we shall deny the Motion as to this claim, while indicating the parameters which will restrict this claim in amount to $1.7 million rather than $2,243,687.00.

12. FIRST ALABAMA BANK (hereinafter referred to as "FAB") LOSS AMOUNT IN ISSUE: $933,730.00

This claim originally included alleged losses by the Debtor from repayment of an FAB warehouse loan that was improperly secured by double-pledged mortgages, two mortgages that did not exist, and one mortgage that was not owned by the Debtor.

How the proceeds were used and which employees were responsible was unclear.

However, according to his Brief, after the depositions were taken, the Trustee discovered new evidence concerning this loss, which reduced it to that in issue in the transaction involving Chase in Claim 6 *supra.* It is also stated that "[t]he same individuals and documentation" apply to this claim as to the Chase claim. It may also be recalled that the Debtor instituted a preference actions against FAB, in which Chase was joined as a third-party defendant, and which was recently settled on terms as yet unknown to us.

The result on this Claim must be the same as our result as to Claim 6, in light of the Trustee's collapsing of its earlier claims to that involved in the Chase transaction. We determined to grant Burnhope's Motion as to Claim 6 because this transaction involved a "mistake" rather than fraud, and because it occurred solely due to the actions of Mr. Micheel. Therefore, our result is the same here, and Burnhope's Motion shall be granted as to this Claim.

I. CONCLUSION

█ Applying the principles set forth at pages 9–29 of this Opinion, we therefore hold that Burnhope is entitled to Summary Judgment only as to Claims 6, 7, and 12. However, the amounts of Claims 2, 3, 4, 9, and 11 are reduced by our discussions herein. Although Claims 8 and 10 were untouched in amount, we indicated what had to be proven to sustain these claims, and it was considerable. Claim 1 was also unscathed directly, but its parameters are most probably defined and reduced in light of our discussion. On the other hand, our discussion revealed that we considered that certain, very substantial claims of the Trustee are viable.

We hope that this Opinion will provide the parties with guidance in reaching a resolution of this matter. We shall direct the parties to attempt to utilize this Opinion as a means for resolving the matter in its entirety in the next thirty days.

However, if a resolution is not forthcoming after the expiration of this period, the

age of the case requires that we compel the parties to press forward to try it. We are therefore drafting our Order in the form of a Pre-Trial Order which will accomplish this result.

## ORDER, INCLUDING PRE–TRIAL ORDER

AND NOW, this 24th day of July, 1987, upon consideration of a Motion of Defendant BURNHOPE for Summary Judgment, and the Briefs of Counsel relevant thereto, and the depositions which are part of the record, it is ORDERED AND DECREED as follows:

1. The aforesaid Motion for Summary Judgment is GRANTED in part and DENIED in part, as described in detail in the text of the foregoing Opinion.

2. The parties are directed to confer to attempt to settle this matter. Counsel for the Trustee shall report on the progress of any such negotiations by letter to the Court, copy to other Counsel, on August 24, 1987.

3. The remainder of this Order is contingent on the failure of the parties to successfully settle this matter.

4. All discovery shall be completed by all parties in this matter on or before November 13, 1987.

5. The Trial of the matter shall be heard on

WEDNESDAY, DECEMBER 16, 1987, at 10:00 A.M. in Courtroom No. 2 (Room 3718), United States Court House, 601 Market Street, Philadelphia, PA 19106.

6. The parties are directed to jointly prepare, file, and serve the following and submit same to the Court on or before December 10, 1987:

 a. A list of all witnesses to be called;

 b. Copies of all exhibits to be offered, pre-marked. Copies of exhibits are to be furnished to opposing counsel on or before December 4, 1987, and any exhibits to which there are objections are to be noted; and

 c. A written stipulation of all undisputed facts.

7. The parties are each directed to file and serve a Trial Brief on or before December 10, 1987.